29 A.3d 617

**Glenn Joseph RAYNOR**

v.

**STATE of Maryland.**

**No. 1629, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 29, 2011.

210

Michael P. Lytle (Byron L. Warnken, LLC, on the brief), Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., MATRICCIANI, JAMES P. SALMON (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

Convicted by a jury in the Circuit Court for Harford County of multiple degrees of rape, assault, burglary, and sexual offense, as well as malicious destruction of property,[1] appellant, Glenn Joseph Raynor, contends, first, that the circuit court erred in denying his motion to suppress DNA evidence recovered, without his knowledge and without a warrant, from

---

1. Appellant was convicted of first- and second-degree rape; second-degree assault; first-, third-, and fourth-degree burglary; malicious destruction of property; two counts of first- and second-degree sexual offense; and one count of third-degree sexual offense. For sentencing purposes, the convictions for third- and fourth-degree burglary and malicious destruction of property were merged into the conviction for first-degree burglary, which was merged, along with the convictions for second-degree rape and second-degree assault, into the conviction for first-degree rape, and the convictions for second- and third-degree sexual offense were merged into the conviction for first-degree sexual offense.

Appellant was sentenced to a term of eighty years for the first-degree rape conviction and two terms of ten years, for each of the first-degree sexual offense convictions, to be served consecutively to each other and the eighty-year sentence, for a total term of one hundred years' imprisonment with credit for the ninety-three days he had already served.

a chair he sat on at the police station and, second, that the court abused its discretion in denying his request for a mistrial because the State had failed to timely disclose certain emails between the victim and the police prior to trial and further neglected to provide other emails either before or after trial. Finding no merit to either contention, we affirm.

## Background

The record, when reviewed in a light most favorable to the State, as the prevailing party, shows that, early on the morning of April 2, 2006, after cutting the victim's telephone line, appellant gained entry to the victim's home by chiseling open the basement door. After entering her bedroom, he pressed a pillow against her face and threatened to kill her if she moved. Then, tying a shirt over the victim's face as a blindfold, he raped her and fled. During the attack, the victim noticed that her attacker had a wedding band on his hand and had a "metallicky odor."

After appellant left her house, the victim ran to her neighbors' house and, from there, called the police. When the police arrived, they took swabs of blood stains that were found on a pillow case on the victim's bed and on the floor of the back patio of the victim's home, underneath a broken window. Later that day, swabs were taken of the victim's vagina and anus.

Appellant did not become a suspect in the investigation of the rape until, more than two years later, the victim sent an email to the lead investigator in the case, Trooper First Class Dana Wenger of the Maryland State Police, stating that she believed that appellant was the man who had raped her. At trial, the victim described the process by which she had come to that conclusion. She explained that, two years after the attack, she had called Bruce Arthur, her former next-door neighbor, for help with a tree on her property. Mr. Arthur owned a tree-trimming business.

Arthur's failure to return her call prompted the victim to reflect as follows:

So, July 15 [2008] ... I am driving home once again going over in my head as I did every day thinking okay, Bruce didn't call me back, why didn't he call me back. And then I am thinking okay, Bruce is partners with [appellant]. And ... my mind starts going.... [Appellant] used to live in [the house in which the attack took place]. [Appellant] has a body type that closely fits the body type of [the attacker]. Then it's oh, [appellant] is married [and] has children, I went to school with [appellant], he lived in that house. He is partners with Bruce....

When she considered the possibility that appellant was her attacker, "it all fit," exclaimed the victim. Pursuing this lead, Trooper Wenger left a note at appellant's home asking him to call her. On July 28, 2008, appellant telephoned Trooper Wenger and agreed to go to the police barracks that afternoon. When he arrived, he was taken to a spare office. During the interview that ensued, Trooper Wenger and Sergeant James Decourcey asked appellant for a DNA sample to compare with the DNA recovered from the pillow case, the broken window, and the victim's body. Appellant agreed to provide a sample on the condition that it would be destroyed after the investigation was concluded. When the officers declined to give such an assurance, appellant refused to provide a DNA sample.

At that time, appellant was wearing a short-sleeved shirt and, according to Trooper Wenger, "kept rubbing his arms up and down the armrests of the chair." The trooper also noticed a "metallic" odor emanating from appellant and observed that he appeared "nervous" and provided "peculiar" answers during the interview. After appellant left the police barracks, Sergeant Decourcey swabbed the armrests of the chair on which appellant had been sitting. The swabs were submitted to the Maryland State Police Forensic Lab, where the forensic sciences supervisor, Bruce Heidebrecht, extracted DNA from the swabs and developed a DNA profile for comparison purposes. That DNA profile was found to match the DNA profile developed from the evidence taken from the pillow case and the patio at the scene of the crime.

▆▆▆▆▆▆▆▆▆▆▆

On the strength of the DNA comparison and circumstantial evidence developed by Trooper Wenger—specifically the victim's identification, appellant's familiarity with the victim and her home, Trooper Wenger's detection of a "metallic" odor emanating from appellant's person, and appellant's nervousness and "peculiar" conduct during his interview with the police—Trooper Wenger obtained warrants to arrest appellant, search his home, and collect an additional DNA sample. The DNA from the additional sample, gathered by swabbing appellant's cheek, also matched the DNA on the pillow case and the patio. An independent lab compared the DNA obtained from appellant's cheek with DNA from swabs of the victim's anus and vagina, taken during the forensic examination the day of the rape, and concluded that neither appellant nor any of his male paternal relatives could be excluded as a potential contributor to that DNA sample, but that 99.57% of the male population in a country the size of the United States could be.

## Discussion

### I.

▆▆▆ Appellant contends that the circuit court erred in failing to suppress the DNA sample gathered from the chair that he sat on at the police barracks.[2] The suppression court denied appellant's motion, concluding that, because appellant did not have "any reasonable expectation of privacy with

---

2. Appellant, we note, insists that the characterization of the biological matter from which the DNA was extracted is of central importance. Although appellant previously referred to the seizure of his "bodily fluids" and of his "sweat," he now asserts that his DNA was extracted from his skin cells and that characterizing the DNA as being taken from his perspiration is "inaccurate and misleading" because the act of shedding skin cells is less familiar than the act of perspiring and leaves no visible residue. As a result, appellant argues that he could not have been aware that he had shed skin cells onto the chair in the police barracks. As we shall explain, appellant lacked an objectively reasonable expectation of privacy in his DNA profile as used for identification purposes, and we therefore do not concern ourselves with what he knew about the shedding of skin cells.

regard to the sweat he left on the chair," the police were lawfully in possession of his DNA.

■ There is no dispute that the officers had the right to swab their own chair without a warrant. It was the property of the police and not of appellant, and thus he had no reasonable expectation of privacy in the chair itself. *See Gamble v. State*, 78 Md.App. 112, 116, 552 A.2d 928 (1989) ("The police needed no warrant to search [an officer's] cruiser since it was police property, and no warrant is required to search one's own property.").

But appellant contends that he had a reasonable expectation of privacy in the DNA contained in his skin cells, even if the police lawfully acquired the skin cells by swabbing their own chair. In the absence of a warrant, the police were prohibited by the Fourth Amendment, maintains appellant, from analyzing the swab they took from the chair, developing a DNA profile, and comparing it to the DNA recovered from the crime scene.

■ In reviewing a trial court's denial of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment, we view the evidence adduced at the suppression hearing and the inferences fairly drawn therefrom in the light most favorable to the prevailing party. *Williamson v. State*, 413 Md. 521, 532, 993 A.2d 626 (2010) (citations omitted). We defer, moreover, to the fact-findings of the suppression court, unless those findings were clearly erroneous. *Id.* But, with respect to the ultimate question of constitutionality, we "make our own independent constitutional appraisal by reviewing the law and applying it to the facts." *Id.* (quoting *Bailey v. State*, 412 Md. 349, 362, 987 A.2d 72 (2010)).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *McFarlin v. State*, 409 Md. 391, 403, 975 A.2d 862 (2009). "The person invoking Fourth Amendment protections bears the burden of demon-

**218**

strating his or her legitimate expectation of privacy in the place searched or items seized." *Williamson,* 413 Md. at 534, 993 A.2d 626 (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).

 The burden of demonstrating a "legitimate" or "reasonable"[3] expectation of privacy includes both a subjective and an objective component. *Id.* First, the individual invoking Fourth Amendment protection must "demonstrate an actual (subjective) expectation of privacy in the item or place searched." *Id.* (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *Venner v. State,* 279 Md. 47, 51–52, 367 A.2d 949 (1977)). A subjective expectation of privacy is demonstrated by a showing that the person "sought 'to preserve something as private.'" *Id.* at 535, 993 A.2d 626 (quoting *McFarlin,* 409 Md. at 404, 975 A.2d 862). Second, the expectation must be "objectively reasonable under the circumstances." *Id.* at 534, 975 A.2d 862 (citing *Laney v. State,* 379 Md. 522, 545, 842 A.2d 773 (2004)). That is, "[a]n expectation of privacy does not give rise to Fourth Amendment protection ... unless society is prepared to accept that expectation as objectively reasonable." *Id.* at 535, 975 A.2d 862 (quoting *California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988)).

The Court of Appeals, in *Williamson v. State,* 413 Md. 521, 993 A.2d 626 (2010), recently addressed the issue of a suspect's reasonable expectation of privacy in DNA evidence recovered from an object in the possession of the police. The DNA sample at issue was obtained, as here, by police without the suspect's knowledge.

The events leading up to the taking of this sample began in 1994. In that year, Kelroy Williamson entered an *Alford*[4] plea

---

3. The terms "legitimate expectation of privacy" and "reasonable expectation of privacy" are used interchangeably. *Wallace v. State,* 373 Md. 69, 80 n. 8, 816 A.2d 883 (2003).

4. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

to a charge of battery stemming from a rape investigation. *Id.* at 526, 993 A.2d 626. Although swabs were collected from the victim in the investigation of that rape, they were not tested at that time for the presence of DNA. *Id.* In 2006, to obtain a DNA sample from Williamson, whom police suspected was involved in a rape committed in 2002, investigators arrested him on charges unrelated to the rape, took him to the police station, and provided him with a meal. *Id.* at 528, 993 A.2d 626. When Williamson, in a holding cell, left the cup from that meal on the cell floor, the cup was tested for DNA. *Id.* The resultant DNA profile matched the profile of the rapist in the 2002 rape, and Williamson was eventually convicted of that crime. *Id.*

Appealing that conviction, Williamson challenged, among other things, the warrantless seizure of the cup and the analysis of the DNA removed from it. The Court of Appeals, first, declared that the Fourth Amendment did not apply to the seizure of the cup because Williamson had abandoned it when, after drinking from it, he tossed it to the floor and that he, therefore, retained no reasonable expectation of privacy in it. *Id.* at 536–37, 993 A.2d 626.

It next rejected Williamson's claim that, even if the cup had been lawfully seized, he retained a reasonable expectation of privacy in his DNA and that the police were therefore prohibited from analyzing the DNA without a warrant. *Id.* at 547, 993 A.2d 626. In so ruling, the *Williamson* Court considered the nature of what had been collected and how it had been used, emphasizing that its collection and use had been in conformity with the strictures of the Maryland DNA Collection Act, which "limits the depth of DNA testing and the storage of the results to that data that is directly related to the identification of an individual." *Id.* at 542, 993 A.2d 626 (citing Md.Code (2003), § 2–505(b) of the Public Safety Article).[5] It further pointed out that DNA profiles used in the

---

**5.** The Maryland DNA Collection Act provides for the collection of DNA samples from individuals who are either charged with or convicted of certain crimes. Md.Code (2003, 2010 Supp.), § 2–504 of the Public

database "consist of analyses of 13 'junk' loci consisting of stretches of DNA, which do not presently recognize traits and were purposely selected because they are not associated with any known physical or medical characteristics." *Id.* (citing *United States v. Davis*, 657 F.Supp.2d 630, 656 n. 6 (D.Md. 2009)). Thus, "the only information collected from testing and storage of DNA profiles," stressed the Court, was "the identity of the person whose DNA [was] being tested." *Id.* at 543, 993 A.2d 626. Hence, the purpose of uploading DNA profiles to a DNA database was "akin to that of a fingerprint." *Id.* (quoting *State v. Raines*, 383 Md. 1, 25, 857 A.2d 19 (2004)). The Court of Appeals further observed that Williamson's arguments "regarding his expectation of privacy in his DNA d[id] not relate to the 13 'junk' loci used for identification, but on the potential misuse of DNA," which was not an issue in the case because Williamson's DNA was tested for identification only. *Id.*

The *Williamson* Court also cited with approval the concurring opinion of the Honorable Irma S. Raker in *State v. Raines*, specifically its discussion regarding the nature of DNA identification evidence. *See Williamson*, 413 Md. at 544, 993 A.2d 626. In *Raines*, the State collected a DNA sample from an inmate pursuant to the Maryland DNA Collection Act. 383 Md. at 5–6, 857 A.2d 19. Because the seizure of the DNA in that case was compulsory and involved the physical intrusion of a swabbing of the inmate's cheek, the State conceded that the act constituted a search but asserted that it was both reasonable and constitutional. *Id.* at 14, 857 A.2d 19. The *Raines* Court held that both the warrantless search and the statute that authorized it were constitutional, noting the

Safety Article. The DNA records developed from such samples are maintained in a statewide DNA database, but "[o]nly DNA records that directly relate to the identification of individuals" may be collected and stored. *Id.* at §§ 2–502, 2–505(b), 2–506(a). In the instant case, appellant's DNA sample was collected prior to the filing of charges against appellant, and, therefore, the DNA Collection Act was not at issue. We note, however, that there is no contention that appellant's DNA was analyzed in a way that would provide more information than is authorized by the Act.

diminished expectation of privacy of incarcerated individuals, the minimal intrusiveness of the search, and the limited nature of the information actually collected from the DNA sample. *Id.* at 15, 17–18, 25, 857 A.2d 19.

In her concurring opinion in *Raines*, Judge Raker stressed that the statute was constitutional because the DNA was used for identification purposes only, explaining that, although a DNA sample *could* provide more personal information than a fingerprint, it need not necessarily do so:

> "DNA type need be no more informative than an ordinary fingerprint. . . . The numbers [constituting the DNA profile] have no meaning except as a representation of molecular sequences at DNA loci that are not indicative of an individual's personal traits or propensities. In this sense, the . . . 'profile' is very much like a social security number. . . . In itself, the series of numbers can tell nothing about a person. But because the sequence of numbers is so likely to be unique (with the exception of identical twins), it can be linked to identifiers such as name, date of birth, or social security number, and used to determine the source of DNA found in the course of criminal investigations. . . ."

*Id.* at 45, 857 A.2d 19 (Raker, J., concurring) (quoting D. Kaye & M. Smith, *DNA Identification Databases: Legality, Legitimacy, and the Case for Population–Wide Coverage*, 2003 Wis. L.Rev. 413, 431–32 (2003)).

 Although *Williamson* involved DNA taken from abandoned property and *Raines* involved DNA removed from the cheek of an incarcerated individual, the lesson as to the nature of lawfully collected DNA evidence is the same. That is, DNA evidence, when used for identification purposes only, is akin to fingerprint evidence. And, although fingerprint evidence is suppressible if it is obtained in the course of an unlawful detention, *see Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); *Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the fingerprinting process itself "involves none of the probing into an individual's private life and thoughts that marks an interrogation or

search." *See United States v. Dionisio,* 410 U.S. 1, 15, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (quoting *Davis,* 394 U.S. at 727, 89 S.Ct. 1394).

Thus, even if appellant could demonstrate a *subjective* expectation of privacy in his DNA profile, he nonetheless had no *objectively reasonable* expectation of privacy in it because it was used for identification purposes only. As in *Williamson,* the police were in lawful possession of the item from which the DNA was collected. In *Williamson,* the cup from which the DNA was collected came into police possession when the suspect discarded it in the holding cell; here, the chair in the police barracks was, from the outset, in the possession of the police. Thus, like the analysis of a latent fingerprint, which involves no physical intrusion into the body and is used for identification purposes only, the analysis in the instant case of DNA evidence, which was in the lawful possession of the police, was not a constitutionally protected search.

And, as in *Williamson,* there is no suggestion here that the police used the swab for anything other than analyzing the 13 "junk" loci for identification purposes. Hence, potential privacy concerns, "should technological advances permit testing of DNA to glean more information from acquired DNA than mere identification," have no "feet" here. *See Williamson,* 413 Md. at 544, 993 A.2d 626.

We note, however, that at least one federal district court has made a distinction between fingerprint and DNA evidence, stating that the latter involved a "greater privacy concern" because of the "potential for the disclosure of a vast amount of intensely personal information." *See United States v. Davis,* 657 F.Supp.2d 630, 663 n. 9 (D.Md.2009).

And it appears that there is growing debate among commentators as to the extent of the information that can be gleaned from the "junk" loci that are analyzed in criminal investigations. In *Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy,* Professor Elizabeth E. Joh argues that "[t]he defense that current DNA sampling techniques target only 'junk' DNA, and thus cannot reveal

medical information, should not assuage privacy concerns . . . as some markers now thought to be meaningless may be (and have been) found to contain predictive medical information as the science progresses." 100 Nw. U.L.Rev. 857, 870 (2006) (footnote omitted). Professor Joh suggests that the comparison between fingerprints and DNA is inapt because, "unlike DNA, fingerprints have a limited identification value" and "cannot reveal any more information about the person from whom they have been collected." *Id.* Likewise, Professor Simon A. Cole cautions that "calling forensic STRs [6] 'junk,' 'not socially or medically significant,' or 'as meaningless as fingerprints' does not inform clearly or completely." *See* Simon A. Cole, *Is the "Junk" DNA Designation Bunk?*, 102 Nw. U.L.Rev. Colloquy 54, 63 (2007) (footnotes omitted). "If some forensic STRs are correlated with genes that cause physical traits, though they do not cause the physical traits themselves," Professor Cole suggests, "the public can be informed of that fact." *Id.*

Professor D.H. Kaye, on the other hand, writes that "[j]ust as the argument that nonfunctional DNA cannot be a threat to privacy is superficial, it would be incomplete and misleading simply to inform the public that an STR profile contains information that is correlated to physical traits such as disease and possibly behavioral predispositions and hence could be used to predict whether an individual will develop a disease." *See* D.H. Kaye, *Please, Let's Bury the Junk: The Codis Loci and the Revelation of Private Information*, 102 Nw. U.L.Rev. Colloquy 70, 71 (2007). "No one can say for certain what the future of genetics holds," says Professor Kaye, "but based on current knowledge and practice, the information coded in the databases is and will remain, with . . . limited exceptions . . . useful only for identification." *Id.* (footnote omitted).

------

**6.** In his article, Professor Cole explains that "[t]hirteen *loci* (locations on the human genome) known as [short] tandem repeats, or 'STRs,' are examined to produce the DNA profiles that are standard for databases in the United States."

We also point out that there are safeguards in the Maryland code that protect against the misuse of DNA records in the statewide database. In fact, subsections 2–512(c) and (e) of the Public Safety Article provide criminal penalties for, among other things, the testing of DNA samples for information unrelated to identification. But those protections, of course, are little comfort to those who do not believe that the State should have such information at its disposal in the first place.

Still, as we have seen, the Court of Appeals declined to draw a distinction between DNA and fingerprint evidence in *Williamson*, and we, of course, shall follow suit.

In an attempt to distinguish fingerprint evidence from DNA evidence and thereby avoid *Williamson's* holding that DNA evidence that is used for identification purposes is "akin to that of a fingerprint," appellant asserts that leaving a fingerprint requires the "volitional act of placing a hand on the surface," while "it requires no effort or volitional act to shed DNA." But neither does it require an effort or a volitional act to leave a fingerprint on an object while touching that object or to deposit saliva and skin cells on a cup while taking a sip from it. Rather, just like the individual who places his hand on an object, intentionally or otherwise, and, in so doing, inadvertently deposits identifying information on the object, appellant walked into the police barracks, sat down on a chair, and rubbed his bare arms on the armrests of the chair, while sitting there. In so doing, he deposited identifying information on the chair.

Further undercutting appellant's proposed distinction is the fact that, as early as 1997, researchers had reported the ability to extract DNA from fingerprints themselves. *See* Roland A.H. van Oorschot & Maxwell K. Jones, *DNA fingerprints from fingerprints*, 387 Nature 767 (1997); Richard Saltus, *DNA in Fingerprints Used as Identifier*, Boston Globe, June 19, 1997, at A5. In the instant case, it appears that the same process, which makes use of "touch DNA," was employed to gather appellant's DNA from the chair in the police barracks. "Touch DNA" is described by the independent lab that pro-

cessed appellant's sample as "the DNA that is left behind from skin cells when a person touches or comes into contact with an item." *See* Touch DNA Evidence—Overview, Bode Technology, http://www.bodetech.com/technologies/touch-dna/touch-dna-overview (last visited May 20, 2011).

We conclude that appellant had no objectively reasonable expectation of privacy in the chair in the police barracks and that he retained no objectively reasonable expectation of privacy in the identifying characteristics that could be gleaned from the normal biological residue he left behind. Consequently, the suppression court did not err in denying appellant's motion to suppress the DNA evidence.

## II.

Appellant contends that the circuit court abused its discretion in not granting a mistrial, first, because the State failed to disclose before trial eighty-nine [7] emails between the victim and the police and, second, because the State failed to provide, either before or after trial, additional emails, the existence of which the State denies.

At trial, the victim testified that, after her rape, she "was in contact with [Trooper] Wenger and other troopers daily" and that she gave Trooper Wenger "multiple leads" in the investigation:

> I mean [Trooper Wenger] was asking me questions about what I did and who I knew and I was thinking of every possible person who it could possibly be. . . . I sent her multiple emails, dozens. No, hundreds of emails I sent.

Although appellant's trial counsel eventually informed the circuit court that he had not received the emails the victim had referred to in her direct testimony, he did not do so until after conducting cross-examination of the victim. In response, the

---

7. Although the exact number of emails is difficult to determine (in part because some of the emails include fragments of other emails), appellant asserts, and the State does not deny, that eighty-nine emails were exchanged between the victim and the police during the period from July 15, 2008, to May 22, 2009.

circuit court ordered the State to determine whether any undisclosed emails existed and, if so, to turn them over to appellant. By the next trial date, which was four days later, the State had provided appellant with copies of previously undisclosed emails between the victim and Trooper Wenger. None pre-dated the victim's email to Trooper Wenger on July 15, 2008, in which she described how she had come to believe that appellant was her attacker.

At trial, appellant claimed that he was entitled to a mistrial because the emails "should have been disclosed" before trial and could have been used as impeachment evidence during his cross-examination of the victim, specifically citing an email from the victim to Trooper Wenger on July 16, 2008, in which the victim said of appellant, "I KNOW his name was brought up, but I don't know why I didn't think for you to swab him." Appellant asserted that this email's reference to an earlier conversation between the victim and Trooper Wenger contradicted the victim's testimony that appellant's name first came to her attention right before she sent the email of July 15, 2008, in which she named appellant as her assailant.

Appellant's trial counsel accused the State of deliberately withholding the emails, alleging that he had made an oral request for emails before trial and that the State did not respond to that request even though the assistant state's attorney knew about the emails because she had been included in some of the correspondence.

In response, the assistant state's attorney denied having received an oral request from appellant for emails and asserted that she had not willfully violated the discovery rules. She further stated that she had simply forgotten about any emails she had sent or received, and the circuit court found this representation to be credible.

While agreeing with appellant that the emails should have been provided before trial, the circuit court denied his motion for a mistrial, finding no deliberate discovery violation by the State. In any event, appellant would have the opportunity, the court pointed out, to question the victim as to when

appellant's name first came up. Notwithstanding that judicial invitation, appellant chose not to conduct any further cross-examination of the victim.

Appellant nonetheless reiterated his complaints at a hearing on his motion for a new trial, claiming that he had suffered "significant[ ] prejudice[ ]" from the State's failure to disclose "information regarding the circumstances under which [appellant's] name came up earlier." The circuit court denied appellant's motion, stating: "Clearly the emails aren't material to the guilt or innocence of the defendant. Nor are they exculpatory. Nor do they reflect on anything that would mitigate punishment."

Appellant now claims that the circuit court abused its discretion in denying his request for a mistrial, a request which was based on the State's failure to disclose the victim's emails before she testified. Assuming, without deciding, that the State violated Maryland Rule 4–263(d)(3), which provides that the state's attorney shall, without request, provide to the defense, "all written statements of [a state's witness] that relate to the offense charged," we hold that the circuit court did not abuse its discretion in denying appellant's motion for a mistrial or in choosing, instead, a less severe remedy for the State's discovery violation.

The remedy for a violation of the discovery rules "is, in the first instance, within the sound discretion of the trial judge." *Williams v. State*, 364 Md. 160, 178, 771 A.2d 1082 (2001) (citing *Evans v. State*, 304 Md. 487, 500, 499 A.2d 1261 (1985)). Rule 4–263(n) provides a list of potential sanctions, including: ordering discovery of the undisclosed matter, granting a continuance, excluding evidence as to the undisclosed matter, granting a mistrial, or entering any other appropriate order. The rule "does not require the court to take any action; it merely authorizes the court to act." *Thomas v. State*, 397 Md. 557, 570, 919 A.2d 49 (2007). Thus, the circuit court "has the discretion to select an appropriate sanction, but also has the discretion to decide whether any

sanction is at all necessary." *Id.* (citing *Evans,* 304 Md. at 500, 499 A.2d 1261). ·

■■■■■ But, in exercising its discretion regarding sanctions for discovery violations, "a trial court should consider: (1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the feasibility of curing any prejudice with a continuance; and (4) any other relevant circumstances." *Id.* at 570–71, 919 A.2d 49 (citations and footnotes omitted). Although "the prosecutor's intent alone does not determine the appropriate sanction, bad faith on the part of the State can justify exclusion of evidence or serve as a factor in granting a harsher sanction." *Id.* at 571 n. 8, 919 A.2d 49. And, if the discovery violation irreparably prejudices the defendant, a mistrial may be required even for an unintentional violation. *Id.* (citing *Evans,* 304 Md. at 501, 499 A.2d 1261).

■■■■ The declaration of a mistrial, however, "is an extraordinary act which should only be granted if necessary to serve the ends of justice." *Barrios v. State,* 118 Md.App. 384, 396–97, 702 A.2d 961 (1997) (quoting *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990)). "The most accepted view of discovery sanctions is that in fashioning a sanction, the court should impose the least severe sanction that is consistent with the purpose of the discovery rules." *Thomas,* 397 Md. at 571, 919 A.2d 49 (citations omitted). We have said that the purpose of the discovery rules "is to give a defendant the necessary time to prepare a full and adequate defense." *Ross v. State,* 78 Md.App. 275, 286, 552 A.2d 1345 (1989). And the Court of Appeals has warned that, if a defendant declines a limited remedy that would serve the purpose of the discovery rules and instead seeks the greater windfall of an excessive sanction, "the 'double or nothing' gamble almost always yields 'nothing.'" *Thomas,* 397 Md. at 575, 919 A.2d 49 (quoting *Jones v. State,* 132 Md.App. 657, 678, 753 A.2d 587 (2000)).

Here, in accordance with *Thomas,* the circuit court considered the reason for the State's failure to disclose, the evidence as to the State's intent, and the prejudice to appellant, that is,

the use to which the emails could have been put. *See Thomas,* 397 Md. at 571, 919 A.2d 49. As for the cause of the violation, the circuit court found that the assistant state's attorney simply forgot about the emails she had sent and received, and we have no reason to conclude that that finding was clearly erroneous. As for the prejudice to appellant, the circuit court, before fashioning a remedy, heard argument from appellant's counsel as to the extent to which the emails were actually inconsistent with the victim's trial testimony and how they could be used for impeachment purposes. Appellant's arguments were, and remain, unconvincing.

Although appellant may have been surprised by the victim's reference to her emails during her direct testimony, the delayed disclosure did not deny him the necessary time to prepare a full and adequate defense. *See Ross,* 78 Md.App. at 286, 552 A.2d 1345. Appellant learned of the emails during the victim's direct examination but did not inform the circuit court that he did not have copies until after he had completed his cross-examination. Thus, appellant's decision to delay informing the circuit court of the issue was what ensured that his cross-examination of the victim would be conducted without the evidence he later characterized as "crucial exculpatory information."

Moreover, with the exception of one State's witness who briefly described the victim's physical examination, the proceedings were halted after appellant learned of the emails and remained so until the State provided them. When the trial resumed, four days later, appellant neither asked for a continuance nor took advantage of the circuit court's offer to allow limited additional cross-examination of the victim about the content of the emails.

Thus, appellant's argument that the only available course of action was to call the victim once again and, in so doing, "go[ ] back to the victim and go[ ] into everything" is undermined by the record. Appellant could have halted the proceedings and obtained the emails before he cross-examined the victim, or he could have recross-examined the victim in a limited manner,

without permitting her to repeat her account of the rape. Appellant took advantage of neither remedial option and, in much the same manner as the defendants in *Thomas* and *Jones*, sought the greater windfall of a mistrial, *see Thomas*, 397 Md. at 575, 919 A.2d 49; *Jones*, 132 Md.App. at 678, 753 A.2d 587, which the circuit court understandably declined to grant.

Appellant further claims that "[t]here is simply no question that ... a multitude of other emails exist that were never disclosed to the defense," citing the amount of email traffic between July 15, 2008, and May 22, 2009; the victim's statement that she sent "hundreds" of emails to Trooper Wenger; and Trooper Wenger's reference, on cross-examination, to "a lot of emails back in '06."

After appellant asserted that there were additional emails that the State had failed to disclose, the circuit court denied appellant's motion for a mistrial, finding that there was no "deliberate discovery violation ... by the State." The context of the discussion in the circuit court sheds light on the nature of the court's ruling.

As noted, after appellant brought the State's failure to disclose the emails to the court's attention, the court instructed the assistant state's attorney that she had a duty to inquire as to the existence of the emails: "So now what you're going to have to do ... is get together with Trooper Wenger and find out where these emails are." Four days later, after having disclosed eighty-nine emails, the State represented to the circuit court that its prior failure "wasn't a willful violation." Finding that representation credible and, consequently, that there had been no deliberate discovery violation, the circuit court denied appellant's motion for a mistrial.

In that context, the court's express finding that the State had violated the discovery rules but that its violation was not deliberate included implied findings, first, that the State had rectified the discovery violation by providing, during trial, the emails that existed between the victim and the police and, second, that any prejudice suffered by appellant would be

cured by the opportunity for limited recross-examination of the victim on the issues raised by the emails. We are not convinced that the victim's reference to sending "multiple . . ., dozens . . . [n]o, hundreds" of emails to Trooper Wenger necessarily meant that the final number mentioned, i.e., "hundreds," was an exact figure. Thus, it was not clearly erroneous for the circuit court to find that the eighty-nine emails that were disclosed constituted the entire set. And, of course, the fact that the victim and Trooper Wenger communicated by email between July 15, 2008, and May 22, 2009, does not necessarily mean that they did so during the preceding thirty-seven months.

We also note that the circuit court's factual findings were made before Trooper Wenger testified, and therefore, in making its findings, the circuit court could not have considered the portion of her testimony, to which appellant now points, in which she referred to "a lot of emails back in '06." When reviewing whether the circuit court's factual findings were clearly erroneous, we think it proper to assess the record as it existed at the time of the circuit court's ruling. *Cf. Duncan v. State*, 64 Md.App. 45, 52, 494 A.2d 235 (1985) ("When we determine whether the trial judge committed an error in admitting or rejecting evidence or in striking out or refusing to strike out evidence previously admitted, we do so on the basis of the record as of the time the ruling was made, not on the basis of facts later developed."). If, as appellant claims, Trooper Wenger's subsequent testimony confirmed the existence of additional emails, appellant should have reasserted his objection and asked the circuit court to reconsider its finding in light of the new testimony.

Moreover, as noted, at trial, appellant did not request a continuance or any remedy other than a mistrial. He did not, for example, seek to subpoena the custodian of the police department's electronic records to determine whether old emails that might have once existed had been destroyed. Indeed, he did not even seek to determine whether the police department had a policy on maintaining emails. Rather,

appellant simply asserted that the "evidence suggest[ed]" that there were additional undisclosed emails. The circuit court's finding to the contrary was not clearly erroneous, and the court did not abuse its discretion in declining, on the record before it, to take the "extraordinary act" of declaring a mistrial.

But, under the circumstances of the instant case, even if there were additional undisclosed emails, the failure, by the State, to disclose those emails did not, contrary to appellant's assertion, violate *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. A *Brady* violation occurs when the State withholds or suppresses evidence that is (1) favorable to the defense (because it was either exculpatory or impeaching) and (2) material to the guilt or punishment of the defendant. *Wilson v. State*, 363 Md. 333, 346, 768 A.2d 675 (2001). If the alleged *Brady* violation pertains to the failure to disclose favorable evidence, the evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 347, 768 A.2d 675 (citations omitted). The Court of Appeals has interpreted the "reasonable probability" standard to mean a "substantial possibility that ... the result of [the] trial would have been any different." *Id.* at 347 n. 3, 768 A.2d 675 (alterations in original) (citations omitted).

Accepting appellant's proffer that the undisclosed emails would have been favorable to the defense because they would have shown that the victim and the police had previously considered and rejected appellant as a suspect, we conclude that there is no substantial possibility that, had the evidence been disclosed, the result of the trial would have been different. The evidence adduced at trial established that appellant's DNA matched the DNA found on the back patio of the victim's home, on a pillow case on her bed, and, with somewhat

less statistical certainty, on swabs of her vagina and anus. Moreover, the impeachment value of any undisclosed emails would have been slight. Even without the emails, the jury heard the victim's testimony that she provided Trooper Wenger with "multiple leads" and discussed with Trooper Wenger "every possible person who it could possibly be." And, although the victim testified that she believed appellant was her attacker, she also testified that the rapist tied a shirt over her face, preventing her from seeing his face. Thus, even if the undisclosed evidence was favorable to the defense because it demonstrated that appellant, whose DNA matched that of the rapist, had been briefly considered as a suspect by the victim at an earlier point in the investigation, it was not material to his guilt because there is no "substantial possibility that ... the result of [the] trial would have been any different" had the evidence been disclosed. *See Wilson*, 363 Md. at 347 n. 3, 768 A.2d 675 (alterations in original) (citations omitted).

**JUDGMENTS AFFIRMED.**

██ **COSTS TO BE PAID BY APPELLANT.**[8]

Concurring Opinion by MATRICCIANI, J.

MATRICCIANI, J., concurring.

I concur in the judgment of the Court. I write separately to provide background on the recent revision of Maryland Rule 4–263.

In April, 2003 the American College of Trial Lawyers issued its "Brady Report," concerning the federal judiciary's experience with the timely disclosure of information favorable to criminal defendants under Federal Rules of Criminal Procedure 11 and 16. The report was a critique of the problems

---

8. Our resolution of this appeal renders moot the State's motion to strike portions of appellant's appendix. *Cf. Eiland v. State*, 92 Md.App. 56, 102–03, 607 A.2d 42 (1992) (noting that a motion to strike a portion of a party's appendix was "to some extent mooted by the assessment of all costs against [that party]" but finding "the problem of the swollen appendix ... sufficiently epidemic to warrant official comment"), *rev'd on other grounds sub nom., Tyler v. State*, 330 Md. 261, 623 A.2d 648 (1993).

associated with the implementation of the constitutional mandate laid down four decades earlier in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[1] It proposed rule amendments to address those problems.

Proposed Rule 16(f) provided:

*Fed.R.Crim.P. 16(f)*

(f) Information Favorable to the Defendant as to Guilt or Punishment.

(1) Within fourteen days of a defendant's request, attorney(s) for the government shall disclose in writing all information favorable to the defendant which is known to the attorney(s) for the government or to any government agent(s), *law enforcement officers or others who have acted as investigators from any federal, state or local agencies who have participated in either the investigation or prosecution of the events underlying the crimes charged.* Information favorable to the defendant is all information in any form, whether or not admissible, that tends to: a) exculpate the defendant; b) adversely impact the credibility of government witnesses or evidence; c) mitigate punishment.

(2) The written disclosure shall certify that: a) the government attorney has exercised due diligence in locating all information favorable to the defendant within the files or knowledge of the government; b) the government has disclosed and provided to the defendant all such information; and c) the government acknowledges its continuing obligation until final judgment is entered; I) to disclose such information; and ii) to furnish any additional information favorable to the defendant immediately upon such information becoming known.

(Emphasis added.)

Holding the prosecutor responsible for disclosure of the *Brady* information obtained and retained by the police flows

---

**1.** *Brady* established a bright-line constitutional duty on the part of a prosecutor to turn over "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. 1194.

from the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), wherein Justice Souter, writing for the Court's majority, held that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Id.* at 437, 115 S.Ct. 1555.

The Brady Report noted that "[b]oth the American Bar Association ("ABA") Standards of Criminal Justice and the Model Rules of Professional Conduct recognize the unique role of the prosecutor and the importance of timely disclosure of favorable evidence to the defense," citing the ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3–3.11(a), and the ABA Model Rule of Professional Conduct, § 3.8(d).[2]

In June, 2004, the Maryland Conference of Circuit Court Judges forwarded to the Court of Appeals Standing Committee on Rules of Practice and Procedure a proposed revision to Rule 4–263, modeled on the federal proposal contained in the Brady Report.

Proposed Maryland Rule 4–263(g) provided:

*Obligations of State's Attorney.* The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members *and any others who have participated in the investigation or evaluation of the action*

---

**2.** These standards read as follows. ABA Criminal Justice Standard 3–3.11(a) provides:

> A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused.

ABA Model Rule 3.8(d) provides:

> A prosecutor in a criminal case shall: ... make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

*and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney.*

(Emphasis added.)

The Rules Committee's Criminal Subcommittee took up the proposed rule revision and referred it to the full committee in September, 2004.[3] The proposal was batted back and forth between the subcommittee and the full committee until September, 2005, when the revised rule became part of the 155th Report to the Court of Appeals, but it was deferred by the Court of Appeals. The debate on the proposed rule was heated and continued with particular objection from a number of state's attorneys to the scope of the required disclosures.[4] Finally, the revised Rule 4–263 was attached as a supplement to the 158th Report of the Rules Committee in March, 2008. It was adopted by the Court of Appeals on April 8, 2008, and became effective on July 1, 2008.

In its present form, Maryland Rule 4–263(c) provides: [5]

(c) **Obligations of the parties.** (1) Due diligence. The State's Attorney and defense shall exercise due diligence to identify all of the material and information that must be disclosed under this Rule.

(2) Scope of obligations. The obligations of the State's Attorney and the defense extend to material and informa-

---

**3.** The minutes of the Rules Committee for September 10, 2004 indicate that a primary purpose in revising the criminal discovery rule was to avoid the surprise of learning about discoverable materials during trial, particularly in situations where the police have not advised the prosecutor of their existence.

**4.** Objections were raised, for example, to disclosure of witness information where witnesses may be intimidated and to the requirement to identify in writing the information provided to the defense. The minutes of the November 19, 2004 Rules Committee meeting demonstrate that the scope of the State's disclosure obligation was much debated as well. This debate continued until the committee recommended adoption of the revised rule on May 11, 2007.

**5.** Rule 4–263 was again amended in 2010, but not with respect to this provision.

tion that must be disclosed under this Rule and that are in the possession or control of the attorney, members of the attorney's staff, *or any other person who either reports regularly to the attorney's office or has reported to the attorney's office in regard to the particular case.*

(Emphasis added.)

The rule cross-references *State v. Williams,* 392 Md. 194, 896 A.2d 973 (2006), a case which predates the revised rule's adoption. In *Williams,* the Court of Appeals extended the duty to disclose information favorable to the defense to "any and all members of the State's Attorney's office, attorneys and staff." *Id.* at 206, 896 A.2d 973. *Williams* was an appeal of a denial of post-conviction relief in a case where the assistant state's attorney at trial was unaware and did not disclose that a state's witness was a paid informant, although the information was known to others in the state's attorney's office. The Court of Appeals based its ruling on the constitutional principles enunciated in *Brady* and on Rule 4–263(g) (the subpart then applicable to the state's attorney's obligation under the rule).

The rape in this case occurred on April 2, 2006. The victim then contacted the state police by e-mail, on and off, up to the date of trial, June 2, 2009. The record indicates that the victim was attempting to provide Trooper Wenger, the investigating officer, with potential suspects. At trial, she testified that she sent her "multiple emails, dozens. No, hundreds of emails ..." Trooper Wenger testified to "a lot of emails back in '06." Mid-trial, the State produced eighty nine e-mails, none of which pre-dated July 15, 2008. Most surprising is the fact that the prosecutor was unaware of the existence of this potential evidence until the victim testified at trial. That is *not* the intent of the criminal discovery rule. The State's Attorney is responsible for determining whether *Brady* information has been obtained by his own staff or *any others who have participated in the investigation.* This means that the State must make appropriate inquiries, within the discovery time-frame, and arrange for the collection and timely disclosure of discoverable material to the defense.

My research has disclosed only two cases addressing the scope of the State's discovery obligations to the defense after adoption of the revised rule.[6] *Lancaster v. State*, 410 Md. 352, 370–82, 978 A.2d 717 (2009), dealt with a protective order issued for State's witnesses allegedly threatened by the defendant. The protective order denied the defendant his right to witness information required to be disclosed by Rule 4–263(b)(1) and "in effect tied [defense] counsel's hands and foreclosed him from pursuing a valuable source of information," thus denying Lancaster effective assistance of counsel. *Id.* It compelled a reversal of his convictions for robbery and assault. *Id.*

In *Yearby v. State*, 414 Md. 708, 997 A.2d 144 (2010), the appellant claimed a *Brady* violation because the investigating detective failed to disclose that he "had developed additional suspects at the time he administered a photographic line-up to Ms. Zongo," the victim. *Id.* at 715, 997 A.2d 144. Because this information was otherwise available to Yearby, the Court of Appeals held that the State had not suppressed it. *Id.* at 726, 997 A.2d 144.

Both cases illustrate the obligation of the State's Attorney to assess information obtained during criminal investigations for potential *Brady* information. As *Williams, supra,* points out, the State's obligations clearly extend to information and materials not contained in the prosecutor's file. The trial court in the case *sub judice* accepted the State's affirmation that all of the victim's e-mails had been disclosed to the defense during trial. While we affirm that finding here, appropriate emphasis must be given to the broad scope of the State's disclosure obligations under Maryland Rule 4–263. It is not difficult to imagine similar situations in which this type of oversight by the State will compel a new trial.

---

**6.** Compare *Dove v. State*, 415 Md. 727 (2010), wherein the Court of Appeals vacated an enhanced sentence due to the State's failure to disclose, pursuant to Rule 4–342(d), a fingerprint card used against Dove at his sentencing hearing.