Opinion by BARBERA, C.J.
This appeal has its genesis in the commission of a rape in 2006. More than two years later, the victim of the rape contacted the police and explained that she suspected that Petitioner, Glenn Joseph Raynor, had been the perpetrator. Shortly thereafter, Petitioner agreed to the request of the police to come to the police station for an interview. At some point during the interview, the police requested Petitioner’s consent to the taking of a DNA sample for comparison to DNA evidence collected at the scene of the rape. He declined. Minutes after the interview concluded and Petitioner had departed the station, the police, who had noticed Petitioner rubbing his bare arms against the armrests of the chair in which he had been seated, took swabs of the armrests in an attempt to collect his DNA. The police submitted those swabs to the crime lab for DNA analysis, which revealed that the DNA extracted from the swabs matched DNA samples investigators had collected from the scene of the rape.
Further investigation ensued and, eventually, Petitioner was charged with first-degree rape and related offenses. He filed a pre-trial motion seeking suppression of the DNA evidence and all evidence derived therefrom, arguing that the warrant-less collection and testing of cellular material that he shed during his interview at the police station violated his right under the Fourth Amendment to be free from unreasonable searches and seizures. The suppression court denied the motion, having concluded that Petitioner had no reasonable expectation of privacy in the DNA evidence left on the chair. The Court of Special Appeals agreed with that ruling.
*75 Petitioner no longer disputes, as he did before the suppression court, that the police lawfully obtained his DNA from the armrests of the chair in the station, and we assume, solely for purposes of our present analysis, that the police were not required to have a warrant or individualized suspicion of Petitioner’s commission of the rape before collecting those DNA samples. Accordingly, the only legal question before us is whether analysis by the police of the 13 identifying “junk” loci contained within Petitioner’s DNA was a search for purposes of the Fourth Amendment. For reasons we shall explain, we hold that the DNA testing at issue in the present case was not a search under the Fourth Amendment.
I.
The rape occurred in Bel Air, Harford County, Maryland during the early morning hours of April 2, 2006. The facts material to its commission and the police investigation that followed are undisputed. At approximately 5:00 a.m., the perpetrator broke into the home of the victim [1] through a patio door that led to the basement. Shortly thereafter, the perpetrator entered the victim’s bedroom, raped her repeatedly, and fled the scene. The victim did not see her attacker’s face because, upon entering the bedroom, he pressed a pillow against her face and blindfolded her with his t-shirt. The victim noticed, however, that her attacker was Caucasian, had a medium build, and emanated a “metallic scent.”
After the perpetrator fled, the victim ran to her neighbor’s home, where she reported the rape to the police. Investigators responded to the victim’s home and a crime scene technician processed it for evidence. The technician collected material possibly containing DNA, including blood from a pillow found in the victim’s bedroom and the area near the door through which the perpetrator had entered. Meanwhile, a police officer accompanied the victim to the hospital where she *76 underwent a rape examination, during which a nurse took vaginal and anal swabs.
The victim contacted the police on numerous occasions throughout the next two years to inform them about potential suspects. During that time, the police obtained consensual DNA samples from approximately 20 individuals with possible connections to the 2006 rape, including several of the victim’s neighbors. None of those DNA samples matched the DNA collected from the victim’s home on the day of the rape.
In July 2008, the victim contacted the lead investigator assigned to the case, Trooper First Class Dana Wenger, to report her suspicion that Petitioner was the rapist. The victim explained that she and Petitioner had gone to school together, he was the previous owner of the home in which the rape occurred, and his body type matched that of the man who raped her. Approximately two weeks later, Trooper Wenger left a note at Petitioner’s home asking him to contact her. A few days later, Petitioner called the trooper and agreed to come to the station later that day to answer questions related to the rape investigation.
Upon Petitioner’s arrival at the station, Trooper Wenger escorted him to a vacant office and directed him to have a seat. Shortly thereafter, Sergeant James DeCourcey entered the room and a 30-minute interview ensued. The officers noted during the interview that Petitioner, who was wearing a short-sleeved shirt, repeatedly rubbed his bare arms against the armrests of his chair, and his body carried a metallic odor similar to the odor the victim had described smelling during the rape.
At some point during the interview, Trooper Wenger asked Petitioner for his consent to the taking of a DNA swab of his mouth. Petitioner responded that he would consent only if the police agreed to destroy the DNA sample after they concluded their investigation of the rape. When the police declined to give that assurance, Petitioner refused to provide a DNA sample, and the interview concluded.
*77 Minutes after Trooper Wenger escorted Petitioner out of the station, Sergeant DeCourcey took swabs of the armrests of the chair in which Petitioner had sat during the interview, sealed those swabs in an envelope, and placed them in an evidence locker. Two days later, Trooper Wenger submitted the swabs to the Maryland State Police Forensic Sciences Division laboratory for DNA analysis. The analysis revealed that the DNA extracted from the swabs of the armrests matched the DNA extracted from blood collected at the scene of the rape.
Trooper Wenger relied upon the results of the lab’s DNA analysis, as well as other evidence the police had gathered during their investigation, in applying for and obtaining warrants to arrest Petitioner, collect an additional DNA sample, and search his home. After arresting Petitioner, the police transported him to the station, interviewed him, and, at some point, took a DNA sample via a buccal swab. That DNA sample, like the DNA samples collected from the chair in the police station, matched DNA collected from the victim’s home on the day of the rape. A second DNA analysis of the buccal swab revealed a match to DNA extracted from the vaginal and anal swabs obtained during the victim’s rape examination.
The State charged Petitioner with several counts of rape, assault, burglary, and related crimes. He was tried before a jury, which heard the results of the DNA analyses and other evidence linking him to the crimes. The jury found Petitioner guilty of two counts of rape and related crimes, for which the court sentenced him to a total of 100 years’ imprisonment.

The Suppression Hearing

Petitioner filed a pre-trial motion to suppress the DNA evidence the police obtained from the chair in the police station, and the fruits derived therefrom.[2] He argued that the *78 police violated his right under the Fourth Amendment to be free from unreasonable searches and seizures, by seizing his genetic material[3] from the armrests of the chair and then searching that material for the 13 loci on the DNA strand that allowed the police to connect him to the rape. He claimed in the alternative that, even if the police officer’s obtaining his genetic material by swabbing the chair was not an unlawful seizure for purposes of the Fourth Amendment, the police nonetheless conducted a separate search that violated the Fourth Amendment when they performed a DNA analysis of the material.[4]
The suppression court denied the motion, reasoning in pertinent part:
[D]oes [the] Fourth Amendment apply at all in this case? ... This is a very simple matter as I see it. Does he have a reasonable expectation of privacy that society is prepared to recognize of what’s left [on] a chair when he gets up and leaves? The answer to that as far as I am concerned is no, he has no such expectation of privacy. He is in a public building.... Yes, he refused [to submit voluntarily a DNA sample], there is no doubt about that. He refused to give consent. So when he refuses to give consent, does that mean that if the police can get [a DNA sample] some other way, they can’t use it? Of course not.
*79 So I think that the seizure of the sample did not violate the Fourth Amendment at all because I don’t think the Fourth Amendment applies in this situation because I don’t think he had any reasonable expectation of privacy with regard to the [genetic material] he left on the chair.
I don’t think DNA is any different in terms of leaving it anywhere than a fingerprint [or] than if he walks out of the [police station] and somebody takes his photograph. He is sitting in there and [the police] ask can we take a picture of you ... to have other people look at it. He says no____So [he] walks outside the [station], is standing on the sidewalk, and they take his picture. He is in a public place. When he goes in there, does he have any expectation that anything he leaves that he is going to continue to have a privacy right in it? I don’t think so. And because I don’t think so, because I don’t think the Fourth Amendment applies at all, because I don’t think he had any reasonable expectation [of privacy] ... that society is prepared to recognize as reasonable, then the same logic applies because the use of [the DNA evidence] to obtain the search warrants also is perfectly legitimate.
So the Motion to Suppress is going to be denied....

The Appeal

On appeal to the Court of Special Appeals, Petitioner contended that, in the absence of a proper warrant, the police were prohibited from “analyzing the swab they took from the chair, developing a DNA profile, and comparing it to the DNA recovered from the crime scene.” Raynor v. State, 201 Md. App. 209, 217, 29 A.3d 617 (2011). The Court of Special Appeals held that the Fourth Amendment did not apply to the testing of the genetic material Petitioner left on the chair, reasoning that Petitioner’s DNA profile was used for identification purposes only and he had “no objectively reasonable expectation of privacy in the identifying characteristics that *80 could be gleaned from the normal biological residue he left behind.” Id. at 225, 29 A.3d 617. The court relied upon certain similarities between DNA evidence and fingerprints: “[L]ike the analysis of a latent fingerprint, which involves no physical intrusion into the body and is used for identification purposes only, the analysis in the instant case of DNA evidence ... was not a constitutionally protected search.” Id. at 222, 29 A.3d 617.
We granted Petitioner’s petition for a writ of certiorari to consider the following questions posed by Petitioner:[5]
1. Whether, under the Fourth Amendment .. .,[6] a free citizen maintains an objectively reasonable expectation of privacy in the DNA found in genetic material involuntarily and unknowingly deposited through ordinary biological processes?
2. Whether, under the Fourth Amendment ..., the determination of an individual’s expectation of privacy requires consideration of the privacy interest in the information obtained, and not just the privacy interest in the place in which it was found?
We also granted the State’s conditional cross-petition, which asks, assuming the Fourth Amendment applies, whether the testing of Petitioner’s genetic material constituted a limited intrusion justified by reasonable suspicion that he had committed the rape and, if not, whether the police conduct in this case compels application of the Fourth Amendment exclusionary rule. Given our disposition of the case on the basis of the threshold questions presented by Petitioner, we need not, and *81 therefore do not, reach the questions the State presents in its conditional cross-petition.
II.
In reviewing the denial of a motion to suppress evidence, as we do here, “we must rely solely upon the record developed at the suppression hearing.” See Briscoe v. State, 422 Md. 384, 396, 30 A.3d 870 (2011). “We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion,” id., here, the State. We accept the suppression court’s factual findings unless they are shown to be clearly erroneous. Id. We, however, make our own independent constitutional appraisal of the suppression court’s ruling, by applying the law to the facts found by that court. Id.
None of the evidence pertinent to the legal issue raised in the present appeal is disputed and the suppression court’s ruling reflects its having credited the testimony of Trooper Wenger and Sergeant DeCourcey. We therefore accept the officers’ testimony related to the collection and testing of Petitioner’s genetic material as we analyze the parties’ legal arguments.
III.
We begin our discussion by clarifying what legal issue is not before us. In his briefs to this Court, Petitioner argues, as he did before the suppression court, that the Fourth Amendment required the police to obtain warrants authorizing both the collection of the genetic material from the armrests of the chair and the DNA testing of that material. During oral argument before us, however, Petitioner, through counsel, stated “for the sake of this discussion, we would concede that, fine, ... it was okay for [the police] to take the stuff off of their chair.” Counsel further conceded that “it really does not matter that much whether it gets analyzed as a one-step process or a two-step process” because “[t]he obvious real issue in this case is the content of what [the police] got when *82 they used their technology to analyze [Petitioner’s DNA].” Given Petitioner’s concession that the police lawfully obtained his genetic material from the armrests of the chair, the precise question for decision is whether law enforcement’s testing of the identifying loci within that DNA material for the purpose of determining whether those loci match that of DNA left at a crime scene constitutes a search under the Fourth Amendment.
The Fourth Amendment to the Constitution of the United States provides, in pertinent part: “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated----” Recently, in Maryland v. King, — U.S. -, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013), the Supreme Court held “that using a buccal swab on the inner tissues of a person’s cheek in order to obtain DNA samples is a search” for purposes of the Fourth Amendment, reasoning that “[v]irtually any intrusio[n] into the human body ... will work an invasion of cherished personal security that is subject to constitutional scrutiny.” Id. at 1968-69 (quotations and citations omitted). The Court did not decide explicitly whether the testing of the 13 identifying loci the police later extracted from King’s DNA sample required a separate Fourth Amendment analysis, and how, if at all, the analysis would have differed had the police obtained King’s DNA absent a physical intrusion into his body.
The case at bar implicates those questions left unanswered in King. For reasons we shall explain, we hold that law enforcement’s analysis of the 13 identifying loci within Petitioner’s DNA left behind on the chair at the police station, in order to determine a match with the DNA the police collected from the scene of the rape, was not a search, as that term is employed in Fourth Amendment parlance.
TV.
It is bedrock constitutional law “that the rights accorded by the Fourth Amendment ‘are implicated only if the conduct of the [government] officials at issue ... infringed an *83 expectation of privacy that society is prepared to consider reasonable.’ ” Walker v. State, 432 Md. 587, 605, 69 A.3d 1066 (2013) (quoting O’Connor v. Ortega, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion)). The test for ascertaining whether a particular form of conduct is a search for purposes of the Fourth Amendment is often referred to as the Katz test, so named for Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the case in which Justice Harlan’s much-quoted concurrence described the test. See id. at 361, 88 S.Ct. 507 (Harlan, J., concurring). Justice Harlan’s formulation remains the lodestar for determining whether police conduct is a search for purposes of the Fourth Amendment. See, e.g., Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (“[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.”).[7]
The Katz test consists of two parts, “each of which must be satisfied in order for the Fourth Amendment to apply: (1) a defendant must ‘demonstrate an actual, subjective expectation of privacy in the item or place searched’ and (2) ‘prove that the expectation is one that society is prepared to recognize as reasonable.’ ” Walker, 432 Md. at 605, 69 A.3d 1066 (quoting Corbin v. State, 428 Md. 488, 499, 52 A.3d 946 (2012)); see also Williamson v. State, 413 Md. 521, 534, 993 A.2d 626 (2010). “A person demonstrates a subjective expectation of privacy by showing that he or she sought ‘to preserve *84 something as private.’ ” Williamson, 413 Md. at 535, 993 A.2d 626 (quoting McFarlin v. State, 409 Md. 391, 404, 975 A.2d 862 (2009)). An objectively reasonable expectation of privacy, by contrast, has “ ‘a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society,’ and constitutes ‘more than a subjective expectation of not being discovered.’ ” Id. (quoting Rakas v. Illinois, 439 U.S. 128, 143-44 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). “We have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable.” Ortega, 480 U.S. at 715, 107 S.Ct. 1492. Nonetheless, common experience and social norms bear upon our assessment of whether one has an objectively reasonable expectation of privacy in a particular item or place. See California v. Greenwood, 486 U.S. 35, 51 n. 3, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (“Expectations of privacy are established by general social norms.”) (citation omitted); 1 Wayne R. LaFave, Search and Seizure § 2.1(d), at 587 (5th ed. 2012) (“[I]t is necessary to look to the customs and values of the past and present ....[,] the structure of society, the patterns of interaction, [and] the web of norms and values.”) (quotations and citations omitted).
Petitioner relies upon the Katz test to argue that the analysis of the identifying loci within his DNA implicated the protections of the Fourth Amendment. He first claims that he demonstrated a subjective expectation of privacy in his DNA when, during the course of his interview with Trooper Wenger and Sergeant DeCourcey, he declined to consent to the taking of a DNA sample, thereby asserting a belief that “his genetic markers would not be inspected.” The State accepts as much, and so do we.
Petitioner further claims, as he must for his argument to prevail, that his expectation of privacy in his DNA, under these circumstances, was objectively reasonable. In making that argument, he urges us to “focus ... squarely on the ‘treasure map’ ... of information capable of being culled from” one’s DNA. He claims that, contrary to the conclusion of the Court of Special Appeals, individuals have a “much *85 greater” expectation of privacy in their DNA than their fingerprints because DNA contains “a massive amount of deeply personal information,” including “medical history, family history, disorders, behavioral characteristics, and ... propensity to . . . commit certain behaviors in the future.”
The State counters that Petitioner did not possess an objectively reasonable expectation of privacy in the information the police analyzed because they tested only 13 junk loci, which, unlike other regions of the DNA strand, do not disclose the intimate genetic information about which Petitioner expresses concern. Instead, those loci reveal only information related to a person’s identity. In this regard, the State argues, law enforcement’s testing of the DNA evidence in this case is indistinguishable from its testing of fingerprints left unknowingly upon surfaces in public places, which does not implicate the protections of the Fourth Amendment.
We agree with the State. The Supreme Court has made clear that one’s identifying physical characteristics are generally outside the protection of the Fourth Amendment. See United States v. Dionisio, 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); see also State v. Athan, 160 Wash.2d 354, 158 P.3d 27, 37 (2007) (en banc) (“Physical characteristics [that] are exposed to the public are not subject to Fourth Amendment protection.”) (citing United States v. Mara, 410 U.S. 19, 21, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973)). The analysis of such physical characteristics by law enforcement “involves none of the probing into an individual’s private life and thoughts that marks” a Fourth Amendment search. See Dionisio, 410 U.S. at 15, 93 S.Ct. 764 (citation omitted). Consequently, the character of the information specifically sought and obtained from the DNA testing of Petitioner’s genetic material—whether it revealed only identifying physical characteristics—is paramount in assessing the objective reasonableness of his asserted privacy interest.
With the advent of DNA testing technology, law enforcement has a highly effective means of identifying an individual as “unique” in the general population and thereby identifying, *86 or excluding, a criminal suspect as the actor in the commission of a crime. King, 133 S.Ct. at 1966 (noting the view among “law enforcement, the defense bar, and the courts” of “DNA testing’s ‘unparalleled ability both to exonerate the wrongly convicted and to identify the guilty’ ”) (quoting Dist. Attorney’s Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 55,129 S.Ct. 2308, 174 L.Ed.2d 38 (2009)). As described in King, “[t]he current standard for forensic DNA testing relies on an analysis of the chromosomes located within the nucleus of all human cells. The DNA material in chromosomes is composed of ‘coding’ and ‘non-coding’ regions.” Id. at 1966-67 (quotations and citation omitted). Coding regions—otherwise known as genes—“contain the information necessary for a cell to make proteins.” Id. at 1967 (citation omitted). Non-coding regions, which do not relate directly to the production of proteins, are generally referred to as junk DNA; it is these regions of junk DNA that are “used with near certainty to identify a person.” Id. Although highly useful for identification purposes, junk DNA “does not show more far-reaching and complex characteristics like genetic traits.” Id.; accord Williamson, 413 Md. at 543, 993 A.2d 626 (noting that the 13 junk loci consist of stretches of DNA that “do not presently recognize traits” and “are not associated with any known physical or medical characteristics”) (citation omitted); State v. Belt, 285 Kan. 949, 179 P.3d 443, 448 (2008) (“In essence, the loci are merely addresses.... ”).[8]
*87 Moreover, as noted by the Supreme Court in King, there exists no incentive for the police to unveil more intimate information contained in a suspect’s DNA, even if the police had access to the technology to do so:
[E]ven if non-coding alleles could provide some [private medical] information, they are not in fact tested for that end. It is undisputed that law enforcement officers analyze DNA for the sole purpose of generating a unique identifying number against which [other] samples may be matched. This parallels a similar safeguard based on actual practice in the school drug-testing context, where the Court deemed it significant that the tests at issue [in those cases] look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic. If in the future police analyze [DNA] samples to determine, for instance, an arrestee’s predisposition for a particular disease or other hereditary factors not relevant to identity, that case would present additional privacy concerns not present here.
133 S.Ct. at 1979 (quotations and citation omitted) (emphasis added); see also Albert E. Scherr, Genetic Privacy & The Fourth Amendment: Unregulated Surreptitious DNA Harvesting, 47 Ga. L.Rev. 445, 474 (2013) (acknowledging that “no evidence currently exists” indicating that police analyze DNA samples “for information ... beyond that provided by the more standard 13-loci ... testing”).
Petitioner does not cite, nor has our research revealed, a case holding that law enforcement’s analysis of fingerprints left behind by a potential suspect implicates the protections of the Fourth Amendment. In fact, the Supreme Court has given, albeit impliedly, the constitutional “go ahead” for such police practices. See Dionisio, 410 U.S. at 14-15, 93 S.Ct. 764; see also Doe v. Poritz, 142 N.J. 1, 662 A.2d 367, 407 (1995) (citing Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), and Dionisio, 410 U.S. at 14, 93 S.Ct. 764, for the proposition that “no person can have a reasonable expectation of privacy in her fingerprints.”). Petitioner, evidently recognizing the Supreme Court’s tacit approval of fingerprint testing, argues not that the police in the present *88 case would have been prohibited from analyzing fingerprints he left behind at the station, but rather, that the DNA evidence in the present case is “physically and functionally different than fingerprints,” and therefore subject to different treatment under the Fourth Amendment.
We disagree with Petitioner that targeted analysis of the identifying loci within genetic material differs in any meaningful way from analysis of a fingerprint. Indeed, it is generally accepted that analysis of a person’s DNA, solely for purposes of identification, reveals no more information about that person than does analysis of his or her latent fingerprints. King, 133 S.Ct. at 1963-64 (“The only difference between DNA analysis and fingerprint databases is the unparalleled accuracy DNA provides.”); accord Williamson, 413 Md. at 542, 993 A.2d 626 (noting that DNA tested for identification purposes is “akin to ... a fingerprint”) (citation omitted). In her concurring opinion in State v. Raines, 383 Md. 1, 857 A.2d 19 (2004), Judge Raker explained the functional similarities between DNA used for identification purposes and fingerprints:
DNA type need be no more informative than an ordinary fingerprint. For example, the [13 junk] loci ... are noncoding, nonregulatory loci that are not linked to any genes in a way that would permit one to discern any socially stigmatizing conditions. The “profile” of an individual’s DNA molecule ... is a series of numbers. The numbers have no meaning except as a representation of molecular sequences at DNA loci that are not indicative of an individual’s personal traits or propensities. In this sense, the [13 loci are] very much like a social security number—though it is longer and is assigned by chance, not by the federal government. In itself, the series of numbers can tell nothing about a person. But because the sequence of numbers is so likely to be unique ..., it can be linked to identifiers such as name, date of birth, or social security number, and used to determine the source of DNA found in the course of criminal investigations ....
383 Md. at 45, 857 A.2d 19 (Raker, J., concurring) (quoting D.H. Kaye & Michael E. Smith, DNA Identification Databas *89 es: Legality, Legitimacy, and the Case for Population-Wide Coverage, 2003 Wis. L.Rev. 413, 431-32 (2003)).
A number of federal courts and the courts of some of our sister states also recognize the functional similarities between the non-coding regions of DNA and fingerprint evidence. E.g., Haskell v. Harris, 669 F.3d 1049, 1063 (9th Cir.2012) (stating that “[t]he collection and use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee’s fingerprints to determine whether he is implicated in another crime”), aff,d en banc, 745 F.3d 1269 (9th Cir.2014); United States v. Mitchell, 652 F.3d 387, 412 (3d Cir.2011) (concluding that “DNA profiles ... function as ‘genetic fingerprints’ used only for identification purposes”); State v. Surge, 160 Wash.2d 65, 156 P.3d 208, 212 (2007) (en banc) (observing that the collection of DNA evidence in that case was “limited to the same purposes as fingerprints, photos, or other identifying information”); see also Edward J. Imwinkelried & D.H. Kaye, DNA Typing: Emerging or Neglected Issues, 76 Wash. L.Rev. 413, 440 (2001) (“[F]or the present the better course is to treat human cells left in public places like fingerprints in deciding what expectation of privacy is reasonable.”).
Petitioner contends that DNA differs from fingerprints because it has the potential to provide more information about a person. Petitioner relies, in part, upon Skinner v. Railway Labor Executives’ Association, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and United States v. Davis, 690 F.3d 226 (4th Cir.2012). The Supreme Court held in Skinner that the toxicological testing of railroad employees’ blood and urine, in order to detect the presence of alcohol or drugs, “intrude[d] upon expectations of privacy that society has long recognized as reasonable” and thus constituted a Fourth Amendment search. 489 U.S. at 609-10, 616-17, 109 S.Ct. 1402 (noting that the “chemical analysis of the sample to obtain physiological data is a[n] ... invasion of the tested employee’s privacy interests”). In Davis, the United States Court of Appeals for the Fourth Circuit, relying upon Skinner, held “that the extraction of Davis’ DNA sample from his *90 [lawfully seized] clothing and the creation of his DNA profile constituted a search for Fourth Amendment purposes.” 690 F.3d at 246. The Davis Court cited Skinner for the following:
[B]ecause the analysis of biological samples, such as those derived from blood, urine, or other bodily fluids, can reveal “physiological data” and a “host of private medical facts,” such analyses may “intrude[ ] upon expectations of privacy that society has long recognized as reasonable.” ... Therefore, such analyses often qualify as a search under the Fourth Amendment____ Similarly, an analysis required to obtain a DNA profile, like the chemical analysis of blood and urine at issue in Skinner, generally qualifies as a search, because an individual retains a legitimate expectation of privacy in the information obtained from the testing.
Id. at 243-44 (citations omitted). The Davis Court added that, at the time police lawfully came into possession of Davis’s clothing, he was not under arrest, but rather, a “free person” among the public at large, who enjoys “a greater privacy interest in [his or her] DNA than would persons who have been arrested.” Id. at 244-45.
Skinner is of little assistance to Petitioner because here, unlike in Skinner, the targeted analysis of the 13 identifying loci did not reveal “physiological data” about Petitioner, but rather, revealed only identifying information. For much the same reason, Davis offers Petitioner little succor. The Davis Court’s conclusion that the DNA testing at issue in that case constituted a Fourth Amendment search rested on what may now be a faulty premise, given the discussion in King that DNA analysis limited to the 13 junk loci within a person’s DNA discloses only such information as identifies with near certainty that person as unique.[9]
*91 Petitioner does not allege that the police in the present case tested any portion of his DNA other than the 13 junk loci, nor does he claim that law enforcement, at present, has the technological capabilities to do so. In short, Petitioner attempts to “evoke images of an oppressive ‘Big Brother’ cataloguing our most intimate traits,” but the reality here is “far less troubling.” Harris, 669 F.3d at 1059; accord Williamson, 413 Md. at 543, 993 A.2d 626 (finding that Williamson’s argument regarding potential misuse of DNA beyond the testing of the 13 junk loci, which was not alleged in the case, did not have “feet”).
Petitioner further claims that DNA is distinguishable from fingerprint evidence because it is not visible to the unaided eye, whereas fingerprints left on a surface are more readily apparent. Even so, the fact remains that a fingerprint, like the genetic material swabbed here, has no independent value to the police until it is tested and compared to other, previously collected fingerprints.
Petitioner finally contends that DNA evidence is used for different purposes than are fingerprints, after it is collected. We disagree. It cannot be doubted that “both DNA and fingerprints can be used to link suspects to crime scenes.” Garcia-Torres v. State, 949 N.E.2d 1229, 1235 (Ind.2011); accord Harris, 669 F.3d at 1063 (“The ... use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee’s fingerprints to determine whether he is implicated in another crime.”). In the present case, had the police dusted the chair in the police station for Petitioner’s fingerprints, that evidence would have been used for the same purpose as his DNA: the police would have analyzed the fingerprints to reveal their identifying characteristics and compared them to any fingerprint evidence collected at the victim’s home.[10] The only distinction that *92 reasonably can be drawn is that the DNA test results in the present case directly linked Petitioner not merely to the crime scene but also directly and with certainty to the rape of the victim.
In determining that Petitioner does not possess a reasonable expectation of privacy in the identifying characteristics of his DNA, we continue down a path set forth by this Court in Williamson v. State, supra. In that case, Williamson, who was in police custody awaiting booking, discarded on the floor of his jail cell an empty cup out of which he had drunk. 413 Md. at 528, 993 A.2d 626. After Williamson was removed from the cell, the police retrieved the discarded cup, submitted it to the crime lab for DNA analysis, and eventually discovered that DNA extracted from the cup matched DNA collected at the scene of a crime committed approximately four years earlier. Id. We addressed several theories advanced by Williamson in connection with the officers’ collection of the discarded cup and the DNA testing of the genetic material that Williamson had left on it. We concluded, first, that he had abandoned any expectation of privacy in the cup itself, id. at 536-38, 993 A.2d 626, and, ultimately, that the police did not violate the Fourth Amendment by testing the lawfully acquired DNA that Williamson had deposited on the discarded cup, id. at 547, 993 A.2d 626.[11]
We addressed Williamson’s contention that he enjoyed a “heightened privacy interest in avoiding DNA testing, because of the amount of information that could be revealed.” Id. at 541, 993 A.2d 626 (emphasis added). We rejected the contention, noting that ‘Williamson’s DNA was tested for identification only” and concluding that the DNA-related information *93 disclosed by examination of only the 13 junk loci was akin to the identifying information contained within fingerprints. See id. at 542-43, 993 A.2d 626.
Petitioner, in arguing that he possessed a reasonable expectation of privacy in his DNA, like Williamson, relies upon the amount of sensitive information police could have unveiled if they misused his DNA for purposes other than identification. Id. at 542-43, 993 A.2d 626. We acknowledged in Williamson that “there may be debate regarding privacy concerns should technological advances permit testing of DNA to glean more information from acquired DNA than mere identification.” Id. at 543, 993 A.2d 626. Those concerns have not been raised in this case. The present case, like Williamson, generates only the question of whether Petitioner had an objectively reasonable privacy interest in the identifying characteristics of his DNA.
Some courts in our sister states have taken a similar tack, holding that “the use of DNA for identification purposes only does not infringe on a privacy interest in one’s genetic identity because the DNA is not being used to reveal personal information.” See Piro v. State, 146 Idaho 86, 190 P.3d 905, 911 (Ct.App.2008) (collecting cases). Closest to the present case is an en banc decision of the Supreme Court of Washington, State v. Athan, supra.
In Athan, the police, who were investigating an unsolved murder, mailed to a suspect, Athan, a fictitious letter, purporting to be from a law firm, asking if he wanted to join a class action lawsuit. 158 P.3d at 31. When the police received Athan’s response, they extracted his DNA from the saliva he had used to close the return envelope, analyzed that DNA, and discovered that it matched a DNA sample recovered from the victim in the unsolved case. Id. at 32. The Athan Court held that the “analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment.” Id. at 37. The court reasoned that “[pjhysical characteristics which are exposed to the public,” such as those *94 contained within one’s DNA, “are not subject to Fourth Amendment protection” because the “[e]xamination of such physical characteristics involves none of the probing into an individual’s private life and thoughts that marks a[ ] ... search.” Id. (quotations and citations omitted). The court further observed that the “[pjolice may surreptitiously follow a suspect to collect DNA, fingerprints, footprints, or other possibly incriminating evidence, without violating that suspect’s” rights under the Fourth Amendment. Id.
We find persuasive the reasoning in Athan. Like Athan, Petitioner exposed to the public, albeit not to the naked eye, the identifying content of the genetic material he left on the armrests of the chaX. Moreover, like Athan, Petitioner was not subjected to the forcible collection of his genetic material, or any other bodily intrusion. See id.
Petitioner argues that, even if the police analyzed only the identifying characteristics of his DNA, he had an objectively reasonable expectation of privacy in that evidence because, unlike fingerprints, blood, or saliva, society is generally unaware that individuals shed uncontrollably genetic material whenever they venture into public. Even assuming that Petitioner is correct in his premise,[12] the fact that one has not knowingly exposed to the public certain evidence does not, by itself, demonstrate a reasonable expectation of privacy in that *95 evidence. “[W]hile Katz says it is no search to discover what one ‘knowingly exposes,’ it does not declare the exact reverse of this proposition. That is, the [Supreme] Court did not say that discovery of what was not knowingly exposed is inevitably a search.” 1 LaFave, supra, § 2.2(d), at 649.
Petitioner finds support for his argument in the Supreme Court’s decision in Kyllo v. United States, supra. There, the police suspected that an individual was growing marijuana within his home. 533 U.S. at 29, 121 S.Ct. 2038. As part of their investigation, the police, who remained in their vehicle across the street from the suspect’s home, used a thermal imager to scan the home. Id. at 29-30, 121 S.Ct. 2038. The scan revealed that the roof over the garage and a side wall were hot compared to the rest of the home, and substantially warmer than neighboring homes. Id. at 30, 121 S.Ct. 2038. Based upon this information, the police believed that the suspect was growing marijuana using halide lights. Id. Relying in part upon the results of the thermal imager scan, the police applied for and obtained a search warrant for the suspect’s home, which, indeed, contained an indoor marijuana growing operation. Id. The Kyllo Court held that, “[w]here, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a ‘search’ and is presumptively unreasonable without a warrant.” Id. at 40,121 S.Ct. 2038.
Petitioner contends that, like the use of thermal imager scanners on homes, the use of biotechnology by police to create DNA profiles reveals characteristics of the person that are not otherwise visible to the naked eye. Kyllo, however, does not stand for the broad proposition that “using ‘sense-enhancing technology’ to acquire information about an individual is, ipso facto, a search.” See D.H. Kaye, Who Needs Special Needs? On the Constitutionality of Collecting DNA and Other Biometric Data from Arrestees, 34:2 J.L. Med. & Ethics 188, 190 (2006). Rather, the central teaching of Kyllo is that “any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much,” because “all details *96 [in the home] are intimate details.” 533 U.S. at 37, 121 S.Ct. 2038 (quotations and citation omitted). The Kyllo Court determined that the thermal imager was, in effect, a substitute for a physical trespass into the home, and thus constituted a search for purposes of the Fourth Amendment. See id. at 34, 121 S.Ct. 2038.
Not so, here. Even if we were to accept that the DNA profiling technology used in the present case is not “in general public use,” [13] it remains that the police did not use that technology as a substitute for a “trespass” on or into Petitioner’s body. See id. The police did not seize genetic material from Petitioner, nor in any way search him for it, but rather, collected it from an object on which the material had been left.
In the end, we hold that DNA testing of the 13 identifying junk loci within genetic material, not obtained by means of a physical intrusion into the person’s body, is no more a search for purposes of the Fourth Amendment, than is the testing of fingerprints, or the observation of any other identifying feature revealed to the public—visage, apparent age, body type, skin color. That Petitioner’s DNA could have disclosed more intimate information is of no moment in the present case because there is no allegation that the police tested his DNA sample for that purpose. Because the testing of Petitioner’s DNA did not constitute a search for the purposes of the Fourth Amendment, he was not entitled to suppression of the DNA evidence or any fruits derived therefrom. The Court of Special Appeals came to the same conclusion. We therefore affirm the judgment of that Court.
JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.
HARRELL, GREENE, and ADKINS, JJ., dissent.

. We do not use the victim’s name or initials in an effort to protect her privacy.

. Petitioner asserted that the warrants to arrest him, collect an additional DNA sample, and search his home were predicated upon the DNA evidence obtained from the armrests of the chair in the police station. He thus sought suppression of any statements he made to *78 police after his arrest, the DNA sample police took after his arrest, and any evidence recovered from his home pursuant to the search warrant.

. Petitioner uses this phrase to describe the perspiration and/or skin cells he shed onto the armrests of the chair during his interview in the police station. For the purposes of our discussion, we shall adopt, in certain places, the term "genetic material.”

. In support of that argument, Petitioner relied upon the so-called "container cases.” E.g., United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). He reasoned that the genetic material he deposited on the chair was a closed “container” with no independent value to the police and that, to "open" the container to reveal its contents, namely Petitioner’s DNA, the police were required to obtain a warrant. The suppression court rejected that theory and, as we shall see, Petitioner does not rely upon that argument on appeal.

. In November 2012, after having granted certiorari, we stayed the present appeal pending resolution by the Supreme Court of the United States of Maryland v. King,-U.S.-, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013). We lifted the stay in August 2013, shortly after the Supreme Court issued its opinion in King.

. Petitioner argued in his petition for writ of certiorari that Article 26 of the Maryland Declaration of Rights provides an independent basis for reversal of the judgment of the Court of Special Appeals. Yet, in his briefs to this Court, Petitioner explains that he does "not endeavor[ ] to address Article 26 as an independent basis for reversal.”

. We do not overlook United States v. Jones, - U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), in which the Supreme Court resorted to a property-based approach to determine whether a Fourth Amendment search had occurred. The Court’s reliance upon principles of trespass law in Jones has not displaced the “reasonable expectation of privacy’’ test set forth in Katz. Indeed, the Jones Court made clear that “we do not make trespass the exclusive test” and “where a classic trespassory search is not involved ... resort must be had to Katz analysis.” 132 S.Ct. at 953-54; see also Florida v. Jardines, - U.S. -, 133 S.Ct. 1409, 1417, 185 L.Ed.2d 495 (2013) (stating that "[t]he Katz reasonable-expectations test ‘has been added to ... ’ the traditional property-based understanding of the Fourth Amendment”) (quoting Jones, 132 S.Ct. at 952).

. The King Court explained the procedure for conducting forensic DNA analysis: "Many of the patterns found in DNA are shared among all people, so forensic analysis focuses on repeated DNA sequences scattered throughout the human genome, known as 'short tandem repeats’ (STRs).” 133 S.Ct. at 1967 (quotations and citation omitted). The analysis involves the examination of "alleles.” See id. (explaining that “[t]he alternative possibilities for the size and frequency of these STRs at any given point along a strand of DNA are known as 'alleles’ ... and multiple alleles are analyzed in order to ensure that a DNA profile matches only one individual”) (citation omitted). The King Court observed that “[fjuture refinements may improve present technology, but even now STR analysis makes it 'possible to determine whether a biological tissue matches a suspect with near certainty.’ ” Id. (quoting Dist. Attorney’s Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 62, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009)).

. For the reasons we have discussed so far, the analysis of the junk loci contained within the DNA collected from the chair is not a Fourth Amendment search because no individual has a reasonable expectation of privacy in his or her identifying physical characteristics. It therefore matters not that, at the time of the analysis, Petitioner was, in the words of Davis, a "free person.” United States v. Davis, 690 F.3d 226, 245 (4th Cir.2012).

. During oral argument, Petitioner argued that the police used his DNA for “traditional crime detection” rather than “just identification.” Other courts have observed, and we agree, that “ ‘[(Identification' encompasses not merely a person’s name, but also other crimes to *92 which the individual is linked.” Haskell v. Harris, 669 F.3d 1049, 1062 (9th Cir.2012).

. The State does not argue in the present case that Petitioner abandoned any expectation of privacy he might otherwise have in the DNA contained in the material left on the chair, but rather, that Petitioner "never had a privacy interest [in his DNA] to abandon.” We therefore do not consider whether Petitioner abandoned an expectation of privacy in the DNA that was tested.

. At least one commentator has suggested that society is generally aware of the nature of DNA evidence:
Society knows about DNA and its capabilities through television and other media. Furthermore, the use of DNA analysis is one click away on the Internet. People can perform DNA tests from their homes, and third parties can obtain the DNA of other individuals without restraint.
DNA evidence is no stranger to pop culture. Anyone who watches television is likely aware that DNA can be left at the scene of a crime. Popular networks broadcast shows such as CSI, Law and Order, and Forensic Files, all of which feature DNA evidence in the laboratory and courtroom on a regular basis, have a combined audience of over fifty-million viewers.
Laura A. Matejik, DNA Sampling: Privacy and Police Investigation.in a Suspect Society, 61 Ark. L.Rev. 53, 78-80 (2008).

. At least one commentator has noted that "the claim that DNA profiling is not in public use is, at worst, false, or at best, in need of refinement or development.” D.H. Kaye, Who Needs Special Needs? On the Constitutionality of Collecting DNA and Other Biometric Data from Arrestees, 34:2 J.L. Med. & Ethics 188, 191 (2006).