# WILLIAM B. HAWKINS *vs.* STATE OF MARYLAND.

### *Evidence—Dying Declarations.*

Upon the trial of an indictment for manslaughter caused by an abortion the evidence showed that on a Tuesday morning the deceased, lying upon her bed, said to her mother, "do get me help, if you don't send for the doctor I will die;" that after the arrival of the doctor she constantly said that she was dying, that she had had an abortion and that it was performed by the defendant; that the deceased also said to the physician, "I am dying now, I want you to relieve me," that the physician administered a hypodermic injection and told her she would be relieved from her agony in a little while; that before and after making the declarations as to the operation that had been performed upon her the deceased repeatedly said that she was dying and that the physician must do something for her.   She died early the next morning.   *Held,* that the declarations made under these circumstances are competent evidence against the defendant and that the cry of the deceased for a physician and for relief did not show that she hoped to recover but was a prayer for relief from the pain she was suffering.

Appeal from the Criminal Court of Baltimore (STOCKBRIDGE, J.)

The cause was argued before MCSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Roland B. Harvey* with whom was *Thos. J. Mason*, on the brief), for the appellant.

*Isidor Rayner, Attorney-General*, for the appellee, submitted the case on his brief.

PEARCE, J., delivered the opinion of the Court.

The appellant in this case, William B. Hawkins, was convicted of manslaughter by an abortion performed on Caroline M. Briele. During the trial, three exceptions were taken, the first being to the admission of an alleged dying declaration proved by the mother of the deceased ; the second being to the subsequent refusal to strike out this proof by Mrs. Briele ; and the third to the admission of a similar declaration proved by Dr. Reiche. These all present the single question of whether they were made under a sense of impending death, and will all be considered together.

Mrs. Briele testified that her daughter was looking badly on Saturday and Sunday, and that on Monday she wished her to stay at home, but she went as usual to her work as a dressmaker, but said she would return at noon if she did not feel better, and that she did return at noon. That she sent for Dr. Reiche to see her daughter, and that he came and left some medicine for her, but that she did not complain of suffering and he made no examination. That the next morning her daughter called to one of the children "Tell mama to come up quick." That she found her lying across the bed, and she said, "Oh mama, do get me help; if you don't send for the doctor I will die;" that this was between eleven and twelve o'clock and the doctor got there about one o'clock ; that she kept repeating "Oh mama, I am dying. I have had an abortion" and that she could see death in her daughter's eyes. That Doctor Reiche sent for Dr. Prentiss to make an examination, and he came that afternoon sometime and made an examination; that while waiting for Dr. Prentiss to come she constantly said she knew she was dying, and that she died about six or seven o'clock Wednesday morning. At this

point the State offered her declaration as to the cause of her death, made on Tuesday, concurrently with her declaring that she knew she was dying, and the objection to this being overruled the first exception was taken.

Mrs. Briele then testified that her daughter said that she went to Mrs. Bell Haslems to have an abortion operation performed, but she would not do it and sent for Dr. Hawkins and he performed the operation. On cross-examination Mrs. Briele said that when she went up stairs Tuesday morning her daughter said: "Oh mama, get the doctor. I am dying— I know I am dying. I asked what is the matter, and she said she had abortion performed, and I said, oh my, by whom? and then she told me." Here counsel for the defense moved to strike out so much of Mrs. Briele's testimony as refers to her daughter's declaration that Dr. Hawkins performed the operation, and his motion being overruled, the second exception was taken.

Dr. Reiche, the family physician, testified that he was called in Monday night, that the girl laughed and said there was nothing the matter with her and he made no examination. That he was called in again in the middle of the day on Tuesday and that as soon as he saw her he knew she was suffering agony; that she said, "Oh doctor, I am dying now, I want you to relieve me." I said what is the matter? You said last night there was nothing, she replied, "I will have to tell you there was an abortion performed." She was in intense agony. I found a hard tumor on the abdomen. She told me all the time she was dying and I must help her and I gave her a hypodermic injection and told her she would be relieved in a little while, and sent for Dr. Prentiss, as her case was not "in my line of practice." That he was called in about four o'clock next morning; that she then said she was dying fast, and she died about an hour and a half later. That both before and after stating to witness the cause of her suffering, she repeatedly said she was dying, and said he must do something for her. Here the State offered her declaration, which was admitted over the objection of counsel for defense,

and Dr. Reiche testified she said the operation was performed
by Dr. Hawkins and Mrs. Bell; that he asked her whether a
man or woman did it, and she said, both did.

To the ruling under which this was admitted, the third ex-
ception was taken.

The admissibility of dying declarations under circumstances
nearly the same as the present, has recently been considered
in the case of *Worthington* v. *The State,* 92 Md. 222, and that
case we thought at the argument was conclusive of this.   The
importance and responsibility however in cases where life or
liberty is involved is such that we have been led to review the
Worthington case and to re-examine the authorities upon the
question.   It is suggested, rather than contended, by the ap-
pellant that no sufficient foundation was laid for the admission
of the declaration in this case, because it does not certainly
appear that the declarant spoke under a sense of impending
death and without any visible hope of recovery.

That the declaration would be inadmissible if there is evi-
dence of any expressed or clearly visible hope of recovery, is
undoubtedly true, since the obligation to speak the truth
would not be that supposed to be created when every hope of
this world is gone, and is not in legal contemplation equal to
that imposed by a positive oath in a Court of justice.   But is
there evidence of any hope of recovery?

The ground of the first exception is that on the day the
declaration was first made when the mother was first called to
her daughter, she said "do get me *help*; if you don't send for
the doctor I will die."   If the declaration rested upon this
foundation alone, we should be compelled to exclude it,
because the form of the expression implies a hope of recovery,
however faint, if the doctor should be procured.   But the
proof is clear that subsequent to this and before making the
declaration admitted, she constantly said she "knew she was
dying," and the mother testified that "she could see death in
her eyes."   This belief of the mother would not avail if not
shared by the daughter, but it is confirmation of the sincerity
of her utterance when she said she knew she was dying—and

we think there was no error in the ruling on this exception.

The second exception is founded on the theory that Mrs. Briele's testimony was so weakened on cross-examination, that it became necessary to strike out the declaration admitted under the first exception.    During this cross-examination Mrs. Briele was asked if she did not testify at a former trial of this case, that the declaration was made when she was first called up stairs Tuesday morning, and before her daughter had referred at all to her dying.    This she denied, and said that at the former trial she testified that at that time her daughter said, "send for a doctor—I am dying ; " that she said "What is the matter? "    Her daughter said she had had an abortion performed.    That she asked by whom—and then she told her, but she still adhered to her statement that before the declaration as to Dr. Hawkins was made she repeatedly said she knew she was dying.    Whatever contradiction or inconsistency in the statements of this witness were developed on cross-examination was for the jury to reconcile, and we discover no error in the refusal to strike out the declaration previously admitted.

The third exception is based upon Dr. Reiche's testimony that when he was called in on Tuesday she said "Oh Doctor, I am dying—I want you to relieve me," and it is argued that this was rather a cry for help than the utterances of an abandonment of hope.    Again it is said that she continued to repeat she was dying and that he must help her, must relieve her in some way.    But to assume in the face of all the testimony in this case that her cry for relief disproved the sincerity of her statement that she knew she was dying, would be to deny to her the privilege of asking the alleviation of what the Doctor said he knew as soon as he saw her was intense agony.    Nor is it a natural or reasonable conclusion that the Doctor did not think death impending, because he gave her a hypodermic injection and told her she would be relieved in a little while. This injection was plainly given to relieve the agony, and it is common knowledge that such treatment does mercifully render suffering or dying persons insensible to pain.    The relief

the doctor promised was what she asked, a respite from
agony, not an escape from death.   And it must not be forgot-
ten that it is not material the physician may think the patient
may or will recover, if he fully believes death is actually im-
pending.   *People* v. *Simpson,* 48 Mich. 474.

In *John's case,* 6 Car. & Payne, 386, it is said that though
the deceased does not state he is conscious of impending
death, if the declaration is made under such circumstances as
in the judgment of the Court will reasonably warrant such in-
ference, it is admissible as a dying declaration, and in *Hall* v.
*Commonwealth,* 2 Grattan, 594, it is said that proof of expec-
tation of death is not confined to declarations of the deceased,
but may be satisfactorily established by the circumstances of
the case.

In *People* v. *Simpson,* 48 Mich. 474, the Court said, "In this
case there was certainly evidence from which the Court below,
under the ruling made must have been satisfied that the de-
ceased was under the belief that death was impending, and the
case would require to be a very strong one to justify this
Court, who did not see the witnesses, in arriving at a different
conclusion."   The case now before us was tried before a careful
and humane Judge in whose wise discretion in these rulings we
can safely repose the confidence to which the above case de-
clares they are entitled.   The views we have expressed are
sustained in 1 *Greenleaf on Evidence,* sec. 158; 1 *Roscoe's
Crim. Evidence,* 53 to 61; *Bishop's New Crim. Proc.,* sec.
1213; *Regina* v. *Peel,* 2 Foster and Finlason, 21, and *McLean*
v. *State,* 16 Ala. 672.

We cannot adopt the view of the Kentucky Court in *Math-
erly* v. *Commonwealth,* 19 S. W. Rep. 977, that the desire to
have a physician sent for clearly indicates in *any case* that the
deceased had hope of living, though he said he was going to
die.   This inference must be controlled by all the circum-
stances of the case.

The case of *Rex* v. *Hayward,* 6 Car. & Payne, 160, relied
on by the appellant is not in conflict with anything we have
said.   There the declaration was made as to who had inflicted

the injury, before anything was said about impending death. Then suddenly the declarant exclaimed. "Oh God I am going fast. I am far too gone to say more," and the declaration was excluded because the Court thought the conviction of impending death then for the first time forced itself upon his mind.

We cannot discover any warrant for reversing the rulings in this case.

*Judgment affirmed with costs above and below.*

(Decided January 12th, 1904.)