Jermaine Hailes v. State of Maryland, No. 62, September Term, 2014

**APPEALABILITY – MD. CODE ANN., CTS. & JUD. PROC. (1973, 2013 REPL. VOL., 2014 SUPP.) § 12-302(c)(4)(i) – DYING DECLARATIONS – CONFRONTATION CLAUSE –** Court of Appeals held that: (I) State may appeal from trial court's exclusion of intangible evidence based on determination that evidence's admission would be constitutional violation; (II) here, declarant made dying declaration two years before dying; and (III) Confrontation Clause of Sixth Amendment to United States Constitution does not apply to dying declarations.

Circuit Court for Prince George's County
Case No. CT121699A

Argued: March 10, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 62

September Term, 2014

_____

JERMAINE HAILES

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Watts, J.

_____

Filed: April 17, 2015

We decide: (I) whether the State may appeal from a trial court's exclusion of intangible evidence based on a determination that the evidence's admission would be a constitutional violation; if so, (II) whether, here, a declarant made a dying declaration two years before dying; and, if so, (III) whether the Confrontation Clause of the Sixth Amendment to the United States Constitution is applicable to dying declarations.

We hold that: (I) the State may appeal from a trial court's exclusion of intangible evidence based on a determination that the evidence's admission would be a constitutional violation; (II) here, a declarant made a dying declaration two years before dying; and (III) the Confrontation Clause is not applicable to dying declarations.

## BACKGROUND

In the Circuit Court for Prince George's County ("the circuit court"), the State, Respondent, charged Jermaine Hailes ("Hailes"), Petitioner, with first-degree murder and other crimes. Hailes moved to suppress a pretrial identification on the grounds that the identification was, among other things: (1) hearsay; and (2) testimonial and inadmissible under the Confrontation Clause.

The circuit court conducted a hearing on the motion to suppress and issued an opinion in which the circuit court found the following facts, which we summarize. On November 22, 2010, Melvin Pate ("Pate") was shot once in the right side of his face. The bullet entered Pate's neck and severed C5, the neck's fifth cervical bone. Pate lost the ability to speak and became quadriplegic (*i.e.*, Pate lost the use of all of his extremities). Pate was taken to Prince George's Hospital Center. On November 24, 2010, Pate was transferred to the Shock Trauma Center at the University of Maryland Medical Center

("Shock Trauma"). Immediately after Pate arrived at Shock Trauma, doctors told Pate that he had twenty-four hours to live, and Pate's eyes welled up with tears.

On November 26, 2010, two detectives of the Prince George's County Police Department showed Pate a photographic array that included a photograph of Hailes. By blinking ("blink hard" if he recognized the person who shot him) in response to the detectives' questions, Pate identified Hailes as the shooter.[1] At that time, Pate was restrained to a hospital bed; was on medical life-support equipment, including a ventilator; had several tubes in his body; and, by all indications, believed that his death was imminent. Pate did not die soon afterward, however. In 2011, Pate was released from Shock Trauma. In November 2012, Pate died as a consequence of complications caused by the gunshot wound.

The circuit court granted the motion to suppress, determining that Pate's identification of Hailes fell under the "dying declaration" exception to the rule against hearsay, but was testimonial and inadmissible under the Confrontation Clause. The State appealed, and the Court of Special Appeals reversed and remanded for trial, holding that: (I) the State could appeal from the circuit court's grant of the motion to suppress Pate's identification of Hailes; (II) Pate made a dying declaration; and (III) the Confrontation Clause does not apply to dying declarations. See State v. Hailes, 217 Md. App. 212, 271, 225, 236, 251-52, 92 A.3d 544, 578, 552, 558, 567 (2014). Hailes filed a petition for a writ

---

[1] The circuit court mistakenly found that this occurred on November 27, 2010, but the parties agree that the correct date is November 26, 2010. Thus, we shall refer to November 26, 2010, as the date Pate identified Hailes.

of *certiorari,* which this Court granted.  See <u>Hailes v. State</u>, 440 Md. 114, 99 A.3d 778

(2014).

**DISCUSSION**

**I.**

Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol., 2014 Supp.) ("CJP") §

12-302(c)(4)(i)[2] provides in pertinent part:

> [T]he State may appeal from a decision of a trial court that excludes
> evidence offered by the State or requires the return of property **alleged to**
> **have been seized in violation of** the Constitution of the United States, the
> Maryland Constitution, or the Maryland Declaration of Rights.

(Emphasis added).

Hailes contends that the State's appeal from the circuit court's grant of the motion

to suppress is not authorized by CJP § 12-302(c)(4)(i).  Specifically, Hailes argues that,

because CJP § 12-302(c)(4)(i) uses the word "seized," CJP § 12-302(c)(4)(i) authorizes the

State to appeal only from a trial court's exclusion of tangible evidence; thus, here, CJP §

12-302(c)(4)(i) does not authorize the State to appeal from the circuit court's exclusion of

Pate's identification of Hailes because it is not tangible evidence capable of being seized.

Alternatively, Hailes asserts that, because CJP § 12-302(c)(4)(i) uses the past-tense phrase

"to have been seized in violation of the Constitution of the United States, the Maryland

Constitution, or the Maryland Declaration of Rights," CJP § 12-302(c)(4)(i) authorizes the

---

[2]In 2014, without amendment, the General Assembly recodified what was then CJP
§ 12-302(c)(3) as what is now CJP § 12-302(c)(4).  For clarity, we refer to what is now
CJP § 12-302(c)(4).

State to appeal only from a trial court's exclusion of evidence based on an existing alleged constitutional[3] violation—as opposed to an exclusion of evidence based on a determination that the evidence's admission itself would be a constitutional violation; thus, here, CJP § 12-302(c)(4)(i) does not authorize the State to appeal from the circuit court's exclusion of Pate's identification of Hailes because the detectives did not violate any constitutional provision in obtaining the identification. The State responds that it can appeal from the circuit court's grant of the motion to suppress because the General Assembly did not intend for the State to be able to appeal from a trial court's exclusion of evidence only where the evidence is tangible and/or where the exclusion is based on an existing alleged constitutional violation.

"In interpreting a statute, a court first considers the statute's language, which the court applies where the statute's language is unambiguous and clearly consistent with the statute's apparent purpose." McCree v. State, 441 Md. 4, 9, 105 A.3d 456, 459 (2014) (brackets, citation, and internal quotation marks omitted). Where the statute's language is ambiguous or not clearly consistent with the statute's apparent purpose, the court "search[es] for [the General Assembly's] intent in other indicia, including the history of the [statute] or other relevant sources intrinsic and extrinsic to the legislative process[,]" in light of: (1) "the structure of the statute"; (2) "how [the statute] relates to other laws"; (3) the statute's "general purpose"; and (4) "the relative rationality and legal effect of various

---

[3]For brevity, we use the words "constitutional" and "constitution" to refer to the Constitution of the United States, the Maryland Constitution, and/or the Maryland Declaration of Rights.

competing constructions." Gardner v. State, 420 Md. 1, 9, 20 A.3d 801, 806 (2011) (citation omitted).

In Derry v. State, 358 Md. 325, 345, 748 A.2d 478, 488 (2000), this Court held that the State cannot appeal from a trial court's exclusion of evidence based only on an alleged violation of a statute—as opposed to an alleged violation of a constitution. This Court stated that, as used in what is now CJP § 12-302(c)(4)(i), the phrase "alleged to have been seized in violation of the Constitution of the United States, the Constitution of Maryland, or the Maryland Declaration of Rights" modifies both "evidence offered by the State" and "property." See id. at 338-39, 748 A.2d at 485.

Here, first, we conclude that CJP § 12-302(c)(4)(i)'s language is ambiguous in that the word "seized" renders unclear whether CJP § 12-302(c)(4)(i) authorizes the State to appeal only from a trial court's grant of a motion to suppress tangible evidence, as opposed to pretrial identifications and other intangible evidence. CJP § 12-302(c)(4)(i)'s legislative history, however, conclusively establishes that the General Assembly did not intend for CJP § 12-302(c)(4)(i) to authorize the State to appeal only from a trial court's grant of a motion to suppress tangible evidence. In 1982, the General Assembly passed Senate Bill 39, which added to CJP § 12-302 a provision whose relevant language is identical to the relevant language of what is now CJP § 12-302(c)(4)(i). See 1982 Md. Laws 3107 (Ch. 493, S.B. 39). Senate Bill 39's file includes a document entitled "S.B. 39 – Criminal Cases – State's Right to Appeal," which states in pertinent part: "[Senate B]ill [39] is aimed at those cases in which the Judge excludes **a defendant's confession**, physical evidence (such

- 5 -

as drugs), or **any evidence** which is at the heart of the State's case." (Emphasis added).[4]

Senate Bill 39 is identical to Senate Bill 196 (Md. 1981), whose file contains the following note on the hearing before the Senate Judicial Proceedings Committee: "The type of evidence which is involved includes physical evidence obtained by search and seizure, **confessions or admissions, and identifications of the defendant**." (Emphasis added). Thus, CJP § 12-302(c)(4)(i)'s legislative history makes clear that the General Assembly intended for CJP § 12-302(c)(4)(i) to apply to both tangible evidence and intangible evidence alike.

Next, we conclude that CJP § 12-302(c)(4)(i)'s language is ambiguous in that the past-tense phrase "to have been seized in violation of" a constitution renders unclear whether CJP § 12-302(c)(4)(i) authorizes the State to appeal only from a trial court's exclusion of evidence based on an existing alleged constitutional violation—as opposed to an exclusion of evidence based on a determination that the evidence's admission itself would be a constitutional violation. CJP § 12-302(c)(4)(i)'s legislative history, however, conclusively establishes that the General Assembly did not intend for CJP § 12-302(c)(4)(i) to authorize the State to appeal only from a trial court's exclusion of evidence based on an existing alleged constitutional violation. As discussed above, CJP § 12-302(c)(4)(i)'s legislative history indicates that the General Assembly intended for CJP § 12-302(c)(4)(i) to broadly apply to various kinds of evidence, from tangible evidence (such as drugs) to

---

[4]In <u>Derry</u>, 358 Md. at 341, 748 A.2d at 486-87, this Court cited the document "S.B. 39 – Criminal Cases – State's Right to Appeal" as evidence of the General Assembly's intent in enacting what is now CJP § 12-302(c)(4)(i).

intangible evidence (such as pretrial identifications). It follows that the General Assembly intended for CJP § 12-302(c)(4)(i) to broadly apply to exclusions based on various constitutional grounds, from existing alleged constitutional violations—as with seizures that were allegedly unreasonable under the Fourth Amendment—to determinations that that the evidence's admission itself would be a constitutional violation—as with pretrial identifications that, if admitted, would allegedly violate the Confrontation Clause. For CJP § 12-302(c)(4)(i)'s purposes, it is a distinction without a difference whether the constitutional violation is the obtaining of the evidence before trial or the admission of the evidence at trial; it would be absurd for CJP § 12-302(c)(4)(i) to apply to one situation, but not to the other.

Thus, we are unpersuaded by Hailes's reliance on <u>Rush v. State</u>, 403 Md. 68, 98, 939 A.2d 689, 706 (2008) ("[W]e have narrowly construed any grant of appellate authority."). Although, generally, a court narrowly construes a statute that allows a party to appeal, the Court cannot construe such a statute so narrowly as to produce absurd results. <u>See</u> <u>Gardner</u>, 420 Md. at 9, 20 A.3d at 806 (A "statute must be given a reasonable interpretation, not one that is absurd, illogical[,] or incompatible with common sense." (Citation omitted)).

For the above reasons, under CJP § 12-302(c)(4)(i), the State may appeal from a trial court's exclusion of intangible evidence based on a determination that the evidence's admission would be a constitutional violation. Thus, here, the State may appeal from the circuit court's grant of the motion to suppress Pate's identification of Hailes based on a determination that admission of the same would violate the Confrontation Clause.

## II.

Hailes contends that the circuit court was incorrect in determining that Pate's identification of him was a dying declaration. Specifically, Hailes argues that the circuit court clearly erred in finding that Pate believed that his death was imminent when he identified Hailes, as Pate did so four days after being shot, two days after being told that he had twenty-four hours to live, and two years before dying. Hailes asserts that, by the time that Pate identified him, Pate's condition had stabilized. The State responds that the circuit court was correct in determining that Pate's identification of Hailes was a dying declaration because the circuit court did not clearly err in finding that Pate believed that his death was imminent when he identified Hailes, given the severity of Pate's injuries and his apparent appreciation of a doctor's prognosis that he had only a short time to live.

In reviewing a trial court's ruling on a motion to suppress, an appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's application of the law to its findings of fact. See Raynor v. State, 440 Md. 71, 81, 99 A.3d 753, 758 (2014). The appellate court views the trial court's findings of fact, "the evidence[,] and [the] inferences that may be drawn therefrom in the light most favorable to the party who prevails on the" issue that the defendant raises in the motion to suppress. Id. at 81, 99 A.3d at 758 (citation and internal quotation marks omitted).[5]

---

[5]Generally, an appellate court views the trial court's findings of fact, "the evidence[,] and [the] inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion" to suppress. Raynor, 440 Md. at 81, 99 A.3d at 758 (citation and internal quotation marks omitted). That said, where (as here) one party prevails on one issue that the defendant raises in the motion to suppress, but does not

In reviewing a trial court's ruling on whether evidence falls under an exception to the rule against hearsay, an appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's application of the law to its findings of fact. See Gordon v. State, 431 Md. 527, 538, 66 A.3d 647, 653 (2013).[6]

Maryland Rule 5-802, also known as the rule against hearsay, states: "Except as otherwise provided by [the Maryland R]ules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." "In a prosecution for an offense based upon an unlawful homicide," Maryland Rule 5-804(b)(2) excepts from the rule against hearsay an unavailable declarant's dying declaration, which is "a statement made by [the] declarant, while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death."

---

prevail on the motion to suppress, the appellate court views the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party that prevailed on the issue insofar as the appellate court considers the issue. Here, the State prevailed on the issue of whether Pate's identification of Hailes was a dying declaration, but did not prevail on the motion to suppress. Thus, in our analysis, we view the circuit court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the State insofar as we consider whether Pate's identification of Hailes was a dying declaration.

[6]We reject Hailes's contention that an appellate court reviews without deference a trial court's finding that a declarant believed that the declarant's death was imminent when the declarant made a statement. A declarant's mental state is a factual matter, not a legal matter. See Gordon, 431 Md. at 536-37, 66 A.3d at 652 (This Court explained that, in ruling on whether a statement is an excited utterance, a trial court makes "factual determinations" that concern "the declarant's subjective state of mind"—specifically, whether the declarant was "excited" when the declarant made the statement.). Thus, in our analysis, we review for clear error the circuit court's finding that Pate believed that his death was imminent when he identified Hailes.

For example, in <u>Connor v. State</u>, 225 Md. 543, 554, 551, 171 A.2d 699, 705, 703 (1961), this Court held that a statement was a dying declaration where the declarant "entreat[ed] that someone take care of [her] baby [and] called for a priest before making the" statement. Similarly, in <u>Meno v. State</u>, 117 Md. 435, 437, 83 A. 759, 760 (1912), this Court held that a statement was a dying declaration where a doctor told the declarant of her "impending death," and the declarant nodded in response to the question "Do you realize that you are going to die?" Likewise, in <u>Worthington v. State</u>, 92 Md. 222, 242, 241, 48 A. 355, 358 (1901), this Court held that a statement was a dying declaration where the declarant "constantly declared she expected to die" and "beg[ed her physician] to save her[,] as she was dying." Under extremely similar circumstances, in <u>Hawkins v. State</u>, 98 Md. 355, 358-59, 57 A. 27, 28 (1904), this Court held that a statement was a dying declaration where the declarant "constantly said [that] she 'knew [that] she was dying,' and the [declarant's] mother testified that 'she could see death in [the declarant's] eyes.'" This Court concluded that these two facts outweighed the circumstance that, earlier, the declarant stated, "[i]f you don't send for the doctor, I will die[,]" which "implie[d] a hope of recovery, however faint"; a statement is not a dying declaration where the declarant has "[a]ny expressed or clearly visible hope of recovery[.]" <u>Id.</u> at 358, 57 A. at 28. By contrast, in <u>Hays v. State</u>, 40 Md. 633, 652, 646 (1874), this Court agreed with the State's contention that a statement was not a dying declaration where "there [wa]s no evidence that [the declarant] expected to die[.]"

Here, viewing the circuit court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the State, we conclude that the

circuit court was correct in determining that Pate's identification of Hailes was a dying declaration, and that the circuit court did not clearly err in finding that Pate believed that his death was imminent when he identified Hailes. It is undisputed that, as the circuit court found, Pate was shot in the right side of his face; that the bullet entered Pate's neck and severed the fifth cervical bone; and that Pate lost the ability to speak and became quadriplegic. Two days after the shooting, Pate was transferred to Shock Trauma. Pate's mother testified that, on that day, a doctor told her and Pate "that he wouldn't make it" and that "[i]t would be very rare if [Pate] made it past [twenty-four] hours because [the doctor] never had a case that survived from this." According to Pate's mother, immediately after the doctor announced this prognosis, "[t]ears came out of [Pate's] eyes." Pate's mother's testimony supports the circuit court's finding that, immediately after Pate arrived at Shock Trauma, doctors told Pate that he had twenty-four hours to live, and Pate's eyes welled up with tears.

Pate's contemporaneous crying tends to prove that he both heard and believed the doctor's prognosis that his death was imminent. Pate's crying also undermines Hailes's allegation that Pate did not communicate that he believed that his death was imminent. In any event, such direct evidence is unnecessary; circumstantial evidence can establish a declarant's belief in imminent death. See Connor, 225 Md. at 551, 171 A.2d at 703-04 ("It is not necessary to prove expressions implying apprehension of death, if it is clear that the [declarant] does not expect to survive the injury. This expectation may be indicated by the circumstances of [the declarant's] condition[.]" (Citation and internal quotation mark omitted)). It is not conjecture to draw reasonable inferences from circumstantial evidence;

- 11 -

thus, we are unpersuaded by Hailes's reliance on Shepard v. United States, 290 U.S. 96, 100 (1933) ("[T]he state of mind must be exhibited in the evidence, and not left to conjecture.").

It is accurate that Pate identified Hailes two days after the doctor's prognosis that Pate's death was imminent; however, the record establishes that Pate was faring just as badly as he had been two days before. As the circuit court found, when Pate identified Hailes, Pate still could not speak or move any of his extremities; could communicate only by blinking; was restrained to a hospital bed; was on medical life-support equipment, including a ventilator; and had several tubes in his body. A nurse from Shock Trauma testified that, when Pate identified Hailes, Pate was on a feeding tube for nutrition and medication, could not breathe on his own because of a collapsed lung, and had a "halo"[7] "screwed in."[8]

We are unconvinced by Hailes's reliance on the circumstance that Pate died two years after he identified Hailes. Hailes relies on Mattox v. United States ("Mattox I"), 146 U.S. 140, 151 (1892), in which the Supreme Court of the United States stated: "The length of time elapsing between the making of the [statement] and the death is . . . to be

---

[7]A halo is "an orthopedic device used to immobilize the head and neck (as to treat fracture of neck vertebrae) that consists of a metal band placed around the head and fastened to the skull usually with metal pins and that is attached by extensions to an inflexible vest[.]" Halo, Merriam-Webster, http://www.merriam-webster.com/dictionary/halo.

[8]At oral argument, Hailes's counsel contended that, between the time of the doctor's prognosis that Pate's death was imminent and the time that Pate identified Hailes, Pate's condition had stabilized thanks to the addition of the medical life-support equipment. The circuit court, however, found that the addition of the medical life-support equipment actually contributed to Pate's likely belief that his death was imminent.

considered[.]" (Citations omitted).  For three reasons, the Supreme Court's statement in Mattox I, 146 U.S. at 151, does not compel us to conclude that the length of time between a statement and the declarant's death is a determinative factor.  First, the Supreme Court's statement appears to be *dicta*, as, in Mattox I, id. at 152, a declarant died "a few hours" after making a statement.  Thus, the Supreme Court's observation was not intended to convey that a lengthy period of time between a statement and a declarant's death may prevent the statement from being a dying declaration.  Second, the Supreme Court's statement is clarified by what the Supreme Court acknowledged immediately afterward: "[I]t is the impression of almost immediate dissolution, and not the rapid succession of death, . . . that renders the" statement a dying declaration.  Mattox I, id. at 151 (citations and internal quotation marks omitted).  Third, the Supreme Court's statement is clarified even further by what the Supreme Court noted later in the same paragraph: "The point is to ascertain the state of the mind at the time the [statement was] made."  Id. at 152.

Significantly, nothing in Maryland Rule 5-804(b)(2) or this Court's precedent indicates that the length of time between a statement and the declarant's death is to be considered in determining whether the statement is a dying declaration.  Certainly, Maryland Rule 5-804(b)(2)'s plain language lacks such a requirement; Maryland Rule 5-804(b)(2) requires only that a declarant "believ[ed] that the declarant's death was imminent[.]"[9]  Although this Court has held that statements were dying declarations in

---

[9]Thus, in Jones v. State, 38 Md. App. 288, 298, 380 A.2d 659, 665 (1977), rev'd sub nom. State v. Frye, 283 Md. 709, 393 A.2d 1372 (1978), the Court of Special Appeals was incorrect in stating: "[A] . . . mere belief of impending death is not sufficient to [make

cases in which declarants died less than a week after making the statements, see Connor, 225 Md. at 548, 171 A.2d at 702 (less than one day); Meno, 117 Md. at 437, 83 A. at 760 (six days); Hawkins, 98 Md. at 356, 57 A. at 27 (one day); Worthington, 92 Md. at 241, 48 A. at 358 (two days), this Court never implied, much less stated, that the length of time between a statement and the declarant's death is to be considered in determining whether the statement is a dying declaration. To the contrary, in Worthington, this Court indicated that the length of time between a statement and the declarant's death is not to be considered in determining whether the statement is a dying declaration. See id. at 242, 48 A. at 358 ("A firm belief that death is impending . . . is sufficient to render the statement [a dying declaration], though the [declarant] . . . may chance to linger on for some days, or even two or three weeks." (Citation and internal quotation marks omitted)).

This Court's statement in Worthington, id. at 242, 48 A. at 358, accords with the circumstance that this Court has consistently focused on—whether the declarant's belief in imminent death was genuine, not whether it was, in hindsight, accurate. See id. at 242, 241, 48 A. at 358 (This Court held that a statement was a dying declaration where the declarant "constantly declared that she expected to die" and "beg[ed her physician] to save her[,] as she was dying."); Connor, 225 Md. at 554, 551, 171 A.2d at 705, 703 (This Court held that a statement was a dying declaration where the declarant "entreat[ed] that someone take care of [her] baby [and] called for a priest before making the" statement.); Meno, 117 Md. at 437, 83 A. at 760 (This Court held that a statement was a dying declaration where

a] statement a dying declaration[.]" (Citations omitted). See also Shepard, 290 U.S. at 100 ("[B]elief that illness will end in death will not avail of itself to make a dying declaration.").

- 14 -

a doctor told the declarant of her "impending death," and the declarant nodded in response to the question "Do you realize that you are going to die?"); Hawkins, 98 Md. at 358-59, 57 A. at 28 (This Court held that a statement was a dying declaration where the declarant "constantly said [that] she 'knew [that] she was dying,' and the [declarant's] mother testified that 'she could see death in [the declarant's] eyes.'"); Hays, 40 Md. at 652, 646 (This Court agreed with the State's contention that a statement was not a dying declaration where "there [wa]s no evidence that [the declarant] expected to die[.]"). In other words, this Court has consistently focused on whether the declarant had "[a]ny expressed or clearly visible hope of recovery[,]" Hawkins, 98 Md. at 358, 57 A. at 28, not whether the declarant did, in fact, recover.

This Court's focus on the declarant's mental state is bolstered—and, indeed, compelled—by the reason why dying declarations are excepted from the rule against hearsay. As the Supreme Court recognized in Mattox I, a dying declaration is considered reliable because a declarant who believes that his or her death is imminent ostensibly lacks any motive to lie. See 146 U.S. at 152 ("[T]he certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose."); accord Connor, 225 Md. at 554, 171 A.2d at 705 (Imminent death "creates an obligation as solemn as that of a positive oath to tell the truth[.]"). Whether a declarant believed that his or her death was imminent when the declarant made a statement depends on what happened before, not after, the declarant made the statement. Obviously, no one can predict the future with absolute certainty; thus, a declarant can genuinely believe, but cannot know for certain, that his or her death is

imminent when the declarant makes a statement. The genuineness of the declarant's belief in imminent death is not diminished by the circumstance that that belief is, in hindsight, inaccurate. Indeed, it would lead to illogical results to consider the length of time between a statement and the declarant's death in determining whether the statement is a dying declaration. For example, a statement by a declarant in critical condition would be a dying declaration where the declarant died soon afterward; yet, the exact same statement by the exact same declarant in the exact same critical condition would not be a dying declaration where, for whatever reason, the declarant survived for years.

Here, we hold that the length of time between a statement and the declarant's death is entitled to little, if any, weight in determining whether a declarant believed that the declarant's death was imminent when the declarant made the statement. See Worthington, 92 Md. at 242, 241, 48 A. at 358; Connor, 225 Md. at 554, 551, 171 A.2d at 705, 703; Meno, 117 Md. at 437, 83 A. at 760; Hawkins, 98 Md. at 358-59, 57 A. at 28; Hays, 40 Md. at 652, 646; Mattox I, 146 U.S. at 151, 152 ("[I]t is the impression of almost immediate dissolution, and not the rapid succession of death, . . . that renders the" statement a dying declaration; "[t]he point is to ascertain the state of the mind at the time the declarations were made." (Citations and internal quotation marks omitted)). Thus, here, the circumstance that Pate died two years after he identified Hailes is entitled to little, if any, weight, and certainly cannot render clearly erroneous the circuit court's finding—supported by the evidence, as discussed above—that Pate believed that his death was imminent when he identified Hailes.

For the above reasons, the circuit court was correct in determining that Pate's

identification of Hailes was a dying declaration.

**III.**

Hailes contends that the circuit court was correct in concluding that admission of Pate's identification of him would violate the Confrontation Clause because the Confrontation Clause applies to testimonial dying declarations. The State responds that the circuit court was incorrect in concluding that admission of Pate's identification of Hailes would violate the Confrontation Clause, and argues that the Confrontation Clause does not apply to dying declarations, even testimonial ones.

An appellate court reviews without deference a trial court's ruling on whether admission of evidence would violate a constitution. See generally McCree, 441 Md. at 9, 105 A.3d at 459 ("We review the ultimate question of constitutionality de novo." (Brackets, citation, and internal quotation marks omitted)).

The Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 68 (2004), the Supreme Court held that, generally, absent a declarant's "unavailability and a prior opportunity for cross-examination" of the declarant, the Confrontation Clause prohibits "testimonial" hearsay. That Court explained that "there is scant evidence that exceptions [to the rule against hearsay] were invoked to admit testimonial statements against the accused in a criminal case" in 1791 (*i.e.,* the year in which "the Sixth Amendment was ratified"). Id. at 56, 46 (emphasis and footnote omitted). In a footnote that immediately followed, the Supreme Court stated:

The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. See, *e.g.*, *Mattox v. United States* [("*Mattox II*")], 156 U.S. 237, 243-244[] (1895); *King v. Reason*, 16 How. St. Tr. 1, 24-38 (K.B.1722); 1 D. Jardine, Criminal Trials 435 (1832); Cooley, Constitutional Limitations, at *318; 1 G. Gilbert, Evidence 211 (C. Lofft ed. 1791); see also F. Heller, The Sixth Amendment 105 (1951) (asserting that this was the *only* recognized criminal hearsay exception at common law). **Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.** See [*King v.*] *Woodcock*, [1 Leach 500], 501-504, 168 Eng. Rep. [352], [] 353-354 [(1789)]; *Reason*, [16 How. St. Tr.] at 24-38; [T.] Peake, [Evidence] 64 [(3d ed. 1808)]; cf. [*King v.*] *Radbourne*, [1 Leach 457], 460-462, 168 Eng. Rep. [330], [] 332-333 [(1787)]. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.

Crawford, 541 U.S. at 56 n.6 (emphasis added). Similarly, in Giles v. California, 554 U.S.

353, 358 (2008), the Supreme Court stated:

We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. See [*Crawford*, 541 U.S.] at 56, n. 6, 62[]. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. See, *e.g.*, []*Woodcock*, 1 Leach [at] 501-504, 168 Eng. Rep. [at] 353-354[]; *State v. Moody*, 3 N.C. 31 (Super. L. & Eq. 1798); *United States v. Veitch*, 28 F. Cas. 367, 367-368 (No. 16,614) (CC DC 1803); *King v. Commonwealth*, 4 Va. 78, 80-81 (Gen.Ct.1817).

Crawford, 541 U.S. at 56 n.6, and Giles, 554 U.S. at 358, were not the first cases in

which the Supreme Court indicated that the Confrontation Clause does not apply to dying

declarations. For example, in Maryland v. Craig, 497 U.S. 836, 847-48 (1990), the

Supreme Court stated:

[W]e have repeatedly held that the [Confrontation] Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial. See, *e.g.*, *Mattox* [*II*], 156 U.S.[] at 243[] ("[T]here could be nothing more directly contrary to the letter of the [Confrontation Clause] than the admission of

dying declarations"[10]); *Pointer* [*v. Texas*],[] 380 U.S. [400], [] 407 [(1965)] (noting exceptions to the confrontation right for dying declarations and "other analogous situations").

Similarly, in Snyder v. Massachusetts, 291 U.S. 97, 107 (1934), the Supreme Court stated that the Confrontation Clause has not

> at any time been without recognized exceptions, as, for instance, dying declarations[.] *Dowdell v. United States*, [221 U.S. 325, 330 (1911) ("Dying declarations, although not made in the presence of the accused, are uniformly recognized as competent [evidence]." (Citing *Mattox* [*II*], 156 U.S. at 243-44))]. Cf. *Robertson v. Baldwin*, 165 U.S. 275, 282 [(1897) (The Confrontation Clause does not "prevent the admission of dying declarations[.]")]; *Motes v. United States*, 178 U.S. 458, 472, 473 [(1900)[11]].

(Italics added). Likewise, in Kirby v. United States, 174 U.S. 47, 61 (1899), the Supreme Court stated: "[T]he admission of dying declarations is an exception [to the Confrontation Clause] which arises from the necessity of the cause. **This exception was well established before the adoption of the [C]onstitution, and was not intended to be abrogated**." (Emphasis added).

The Supreme Court's statement in Kirby, id., explains why that Court has consistently indicated that the Confrontation Clause does not apply to dying declarations:

---

[10]In Mattox II, 156 U.S. at 243-44, the Supreme Court continued:

[Y]et from time immemorial[, dying declarations] have been treated as competent [evidence], and no one would have the hardihood at this day to question their admissibility. They are admitted, not in conformity with any general rule regarding the admission of [evidence], but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice.

[11]In Motes, 178 U.S. at 472, the Supreme Court actually referred to statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay, not dying declarations.

- 19 -

Dying declarations were an exception to the common law right of confrontation when the Sixth Amendment was ratified. This accords with the Supreme Court's logic in Crawford, 541 U.S. at 54 (The Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." (Citing Mattox II, 156 U.S. at 243)). See also Giles, 554 U.S. at 358 (same) (quoting Crawford, 541 U.S. at 54).[12] Accordingly, in Giles, 554 U.S. at 377, 359, 357, the Supreme Court held that the Confrontation Clause applies to testimonial statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay under California law (which, in contrast to the law of "forfeiture by wrongdoing" when the Sixth Amendment was ratified, did not require that the defendant caused the declarant's death with the purpose of preventing the declarant from testifying), as such an exception to the common law right of confrontation would have been "unheard of at the time of the founding[.]"

Here, we reach the same conclusion that the Supreme Court has consistently endorsed for more than a century, and hold that the Confrontation Clause does not apply to dying declarations. See Mattox II, 156 U.S. at 243-44; Robertson, 165 U.S. at 282; Kirby, 174 U.S. at 61; Dowdell, 221 U.S. at 330; Snyder, 291 U.S. at 107; Pointer, 380 U.S. at 407; Craig, 497 U.S. at 847-48; Crawford, 541 U.S. at 56 n.6; Giles, 554 U.S. at

_____

[12]In other words, in Crawford, 541 U.S. at 54, and Giles, 554 U.S. at 358, the Supreme Court indicated that the Confrontation Clause incorporated both the common law right of confrontation **and** the exceptions to that right. This forecloses Hailes's contentions that there is no evidence that the Framers intended for the Confrontation Clause not to apply to dying declarations and that, had the Framers so intended, the Confrontation Clause would have reflected as much.

358.

Although it is accurate that, in Crawford and its progeny, the Supreme Court has not yet held that the Confrontation Clause does not apply to dying declarations, our holding is entirely consistent with Crawford and its progeny. In Crawford, 541 U.S. at 54, the Supreme Court stated that the Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding"; for that proposition, that Court relied on Mattox II, 156 U.S. at 243, which is the earliest case in which the Supreme Court indicated that the Confrontation Clause does not apply to dying declarations. The reason why is clear: Dying declarations were an exception to the common law right of confrontation when the Sixth Amendment was ratified. See Kirby, 174 U.S. at 61 ("[T]he admission of dying declarations is an exception [to the Confrontation Clause] which arises from the necessity of the cause. This exception was well established before the adoption of the [C]onstitution, and was not intended to be abrogated."). This accords with Crawford and its progeny, in which the Supreme Court has held that the Confrontation Clause applies to testimonial statements of types as to which—in contrast to dying declarations—there was no exception to the common law right of confrontation when the Sixth Amendment was ratified. See, e.g., Crawford, 541 U.S. at 68, 40 (statements against penal interest); Giles, 554 U.S. at 377, 359, 357 ("forfeiture by wrongdoing" under California law); Davis v. Washington, 547 U.S. 813, 834, 821, 819 (2006) (excited utterances); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) (purported business records and public records). Indeed, as the Supreme Court recognized in Crawford, dying declarations are an anomaly with regard to

the Confrontation Clause. See 541 U.S. at 56, 56 n.6 ("[T]here is scant evidence that exceptions [to the rule against hearsay] were invoked to admit testimonial statements against the accused in a criminal case"; "[t]he one **deviation** we have found involves dying declarations . . . . If this **exception** [to the Confrontation Clause] must be accepted on historical grounds, it is *sui generis*." (Footnote and some emphasis omitted)).

Hailes raises red herrings in contending that dying declarations are not inherently reliable and that, under Crawford id. at 61-62, testimonial dying declarations are reliable if and only if they are subject to cross-examination. As an initial matter, Hailes's first contention is incorrect; as noted above in Part II, a dying declaration is considered reliable because a declarant who believes that the declarant's death is imminent ostensibly lacks any motive to lie. See Mattox I, 146 U.S. at 152; accord Connor, 225 Md. at 554, 171 A.2d at 705. In any event, the Confrontation Clause does not apply to dying declarations, not because dying declarations are inherently reliable, but instead because excluding dying declarations for lack of cross-examination would result in a failure of justice. This is established by the very case on which Hailes relies: Carver v. United States, 164 U.S. 694, 697 (1897), in which the Supreme Court stated:

> A dying declaration by no means imports absolute verity. The history of criminal trials is replete with instances where witnesses, even in the agonies of death, have, through malice, misapprehension, or weakness of mind, made declarations that were inconsistent with the actual facts; and it would be a great hardship to the defendant, who is deprived of the benefit of a cross-examination, to hold that he could not explain them. Dying declarations are a marked exception to the general rule that hearsay [statements are] not admissible, and are received from the necessities of the case, and **to prevent an entire failure of justice, as it frequently happens that no other witnesses to the homicide are present**.

(Emphasis added); see also Mattox II, 156 U.S. at 244 (Dying declarations "are admitted, not in conformity with any general rule regarding the admission of [evidence], but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice."). Thus, in both Carver, 164 U.S. at 697, and Mattox II, 156 U.S. at 244—just like in Crawford, 541 U.S. at 56 n.6—the Supreme Court indicated that dying declarations are an "exception" to the Confrontation Clause, and thus need not be subject to cross-examination. By way of comparison, in Crawford, the Supreme Court noted that the Confrontation Clause does not apply to statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay,[13] not because such statements are inherently reliable, but instead because excluding such statements for lack of cross-examination would result in a failure of justice. See 541 U.S. at 62 ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on **essentially equitable grounds**; it does not purport to be an alternative means of determining reliability." (Emphasis added) (citation omitted)).

For the above reasons, the Confrontation Clause does not apply to dying declarations. Here, as discussed above in Part II, Pate's identification of Hailes is a dying

---

[13]For the Confrontation Clause's purposes, it is appropriate to liken dying declarations to statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay, as both dying declarations and statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay were exceptions to the common law right of confrontation when the Sixth Amendment was ratified. See Giles, 554 U.S. at 358-59 ("[T]wo forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were [dying] declarations . . . . [The] second [was] forfeiture by wrongdoing[.]" (Citations omitted)).

- 23 -

declaration; thus, the Confrontation Clause does not apply to Pate's identification of Hailes,[14] and we need not, and do not, address whether Pate's identification of Hailes was testimonial or non-testimonial, as the distinction is irrelevant in the context of dying declarations.[15]

---

[14]In Giles, 554 U.S. at 377, 359, 357, the Supreme Court made clear that the Confrontation Clause does not apply to a type of statement if and only if the type of statement was an exception to the common law right of confrontation when the Sixth Amendment was ratified; thus, although the Confrontation Clause does not apply to statements that would have fallen under the "forfeiture by wrongdoing" exception to the rule against hearsay when the Sixth Amendment was ratified, the Confrontation Clause does apply to testimonial statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay under California law (which differed from the law of "forfeiture by wrongdoing" when the Sixth Amendment was ratified).

That said, we see no difference between dying declarations when the Sixth Amendment was ratified and dying declarations under current Maryland law as we have interpreted it above in Part II. Both when the Sixth Amendment was ratified and under current Maryland law, an unavailable declarant's statement is a dying declaration if and only if the declarant made the statement "while believing that the declarant's death was imminent," and the statement "concern[ed] the cause or circumstances of what the declarant believed to be his or her impending death." Md. R. 5-804(b)(2); cf. Giles, 554 U.S. at 358 (When the Sixth Amendment was ratified, a dying declaration was a statement "by a speaker who was both on the brink of death and aware that he was dying." (Citations omitted)). What matters is that, when the declarant made the statement, the declarant believed that the declarant was on the brink of death, even if the declarant did not go over that brink soon afterward—as long as the declarant is unavailable at the time of the trial or hearing. See Mattox I, 146 U.S. at 151 ("[I]t is the impression of almost immediate dissolution, and not the rapid succession of death, . . . that renders the" statement a dying declaration. (Citations and internal quotation marks omitted)).

[15]In determining that Pate's identification of Hailes was testimonial and inadmissible under the Confrontation Clause, the circuit court incorrectly assumed that the Confrontation Clause can apply to a dying declaration. Apparently, the circuit court based its assumption on Michigan v. Bryant, 562 U.S. 344, 131 S. Ct. 1143 (2011), and Head v. State, 171 Md. App. 642, 912 A.2d 1 (2006). Neither case supports the proposition that the Confrontation Clause can apply to a dying declaration. Bryant involved an excited utterance, not a dying declaration. See 562 U.S. at ___, 131 S. Ct. at 1151 n.1. In Head, 171 Md. App. at 660, 661 n.10, 912 A.2d at 12, 12 n.10, the Court of Special Appeals held that a certain dying declaration was nontestimonial; thus, that Court found it "unnecessary

- 24 -

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  PETITIONER TO PAY COSTS.**

---

. . . to decide" whether the Confrontation Clause applies to dying declarations.  Curiously, here, the circuit court correctly acknowledged that "dying declarations have historically been an exception to the" Confrontation Clause, yet the circuit court declined to apply that legal principle because of this case's unique facts.